**NATURAL RESOURCES DEFENSE COUNCIL, et al., Plaintiffs,**

v.

**Kirk C. RODGERS, etc., et al., Defendants.**

**No. CIV.S–88–1658 LKK.**

United States District Court, E.D. California.

July 28, 2005.

Adam B. Wolf, UCLA School of Law, Los Angeles, CA, Cynthia L. Koehler, Environmental Defense Fund, Michael Ramsey Sherwood, Oakland, CA, Fred H. Altshuler, Michael Rubin, Fred H. Altshuler, Altshuler, Berzon, Nussbaum, Rubin & Demain, Hamilton Candee, Katherine Scott Poole, Natural Resources Defense Council, John B. Clark, Thelen Reid and Priest LLP, Patrick O'Donnell, Judicial Council/AOC, Philip F. Atkins–Pattenson, Sheppard Mullin Richter and Hampton, Brian E. Gray, San Francisco, CA, Laurens Herby Silver, California Environmental Law Project, Mill Valley, CA, for Plaintiffs.

Stephen M. Macfarlane, U.S. Department of Justice, Environment & Natural Resources Division, Jennifer T. Buckman, James E. Thompson, Best Best & Krieger LLP, Maria A. Iizuka, U.S. Department of Justice, Lee N. Smith, Stoel Rives LLP, Sacramento, CA, Jason Cohen, K. Jack Haugrud, Eileen Sobeck, John L. Marshall, United States Department of Justice, Environment & Natural Resources Division, Washington, DC, Gary W. Sawyers, D. Tyler Tharpe, Kimble MacMichael and Upton, Fresno, CA, Gregory K. Wilkinson, Best Best and Krieger, Riverside,

CA, Denslow Brooks Green, Green Green and Rigby, Madera, CA, Ernest Albert Conant, Law Offices of Young Wooldridge, Bakersfield, CA, Jan Leslie Kahn, Kahn, Soares & Conway, LLP, Hanford, CA, Jeffrey A. Meith, Minasian Spruance Meith Soares and Sexton, Oroville, CA, Kenneth A. Kuney, Dooley and Herr LLP, Daniel M. Dooley, Dooley Herr & Peltzer, LLP, Visalia, CA, for Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT RELATING TO THE ENDANGERED SPECIES ACT

KARLTON, Senior District Judge.

Pending before the court is plaintiffs' motion for summary adjudication as to liability on their claims relating to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*[1] Plaintiffs allege that the United States Bureau of Reclamation ("Bureau" or "BOR"), the National Marine Fisheries Service ("NMFS"), and the Fish and Wildlife Service ("FWS") failed to examine critical issues in their biological opinions before executing twenty-five year water contracts in late 2000 for the delivery of California Water Project water to over two dozen irrigation and water districts in the Friant, Hidden, and Buchanan units.

The Friant defendants bring a cross-motion for summary adjudication and the federal defendants have filed an opposition to the plaintiffs' motion.[2]

## I.

## UNDISPUTED FACTS [3]

### A. BACKGROUND

The Bureau's operation of Friant Dam dried up many miles of the San Joaquin River, destroying the historic fish populations. Pls.' SUF 1, citing *NRDC v. Patterson*, 333 F.Supp.2d 906, 924 (E.D.Cal. August 27, 2004). The Bureau's operation of Friant Dam also extirpated numerous species of native fish from the upper San Joaquin River, including spring-and fall-run Chinook salmon.

The operation of the Dam has supported irrigated agriculture through a large swath of the San Joaquin Valley. Pls.' SUF 2, 3, citing *NRDC v. Patterson, id.* The Bureau delivers the diverted waters of the San Joaquin to more than two dozen irrigation and water agencies that are

---

1. During the January 20, 2005 Status Conference, the parties represented to the court that it was in the interest of the parties to first resolve all the liability issues before turning to remedies. The parties also stated their preference that the court first resolve causes of action relating to liability under the Endangered Species Act before turning to the remaining causes of action. Consequently, this order covers only the plaintiffs' ESA claims, or causes of action four through six of the seventh amended complaint.

2. Defendant–Intervenors (San Luis & Delta–Mendota Water Authority and Tehama–Colusa Canal Authority)("intervenors") have also filed a "motion for summary judgment." Plaintiffs' objection to intervenors' statement of undisputed facts ("SUF") is sustained. Intervenors have filed two statements of undisputed facts, one submitted on October 7 with their motion for summary judgment, and one on November 19, 2004, with their opposition. Intervenor's first appropriately filed SUF and corresponding motion for summary judgment addressed plaintiffs' third, seventh, and eight causes of action, which were dismissed in the court's January 25, 2005 order. Intervenors' motion for summary judgment filed during this round of briefing relies on the second filed SUF on November 19, 2004, a submission which violates Local Rule 56–260. Consequently, the court will not entertain intervenor's arguments in this round of briefing. The court has examined the intervenors' "motion for summary judgment" and determines they will not be prejudiced by this order as their arguments are adequately represented by the Federal and Friant defendants.

3. All facts are undisputed unless otherwise noted.

represented in this litigation by the Friant defendants. It presently makes these deliveries under long-term water supply contracts that provide for the Bureau annually to divert, impound, and deliver up to 2.14 million acre-feet to the contractors per year. Pls.' SUF 4.

After a number of renewed contracts were rescinded as a result of this court's order in 1997 (affirmed by the Ninth Circuit in 1998), the Bureau delivered water to the Friant contractors pursuant to short term, or "interim" contracts, which plaintiffs did not challenge. Pls.' SUF 5.

## B. RENEWAL OF CONTRACTS IN 2001 & AGENCY CONSULTATION UNDER ESA

### 1. *ESA Consultation on the Friant District Contracts*

In late 2000, the Bureau determined to execute a new round of water contracts.[4] Pls.' SUF 6, citing FWS AR 06017924.

In a July 2000 electronic-mail ("e-mail") message from Frank Michny, an employee of the Bureau, to Cay Goude, a FWS employee, explained that "everyone in the dept up to/including Leshy want [sic] the contract renewals this year." Pls.' SUF 6, citing FWS AR 0617394.[5] FWS issued its biological opinion ("BiOp") on these contracts on January 19, 2001 and NMFS issued its biological opinion on the following morning, January 20, 2001. In a letter dated October 30, 2000, the Bureau requested that NMFS concur in a Section 7 determination that the Friant contracts were not likely to adversely affect listed species. NMFS refused to do so, forcing the Bureau to request formal consultation for the long-term renewal of the Central Valley Project water service contracts on January 5, 2001. Pls.' SUF 7, citing NMFS AR 000526. As of January 5, 2001, the Bureau had not provided a final biological assessment on the Friant contracts. The Bureau provided the biological assess-

---

4. The "Friant contracts" that plaintiffs seek to invalidate in this litigation are: Arvin–Edison Water Storage District (14–06–200–229A–LTR1); Chowchilla Water District—Friant Division (I75r–2358–LTR1); Delano–Earlimart Irrigation District (I75r–3327–LTR1); Exeter Irrigation District (I75r–2508–LTR1); Fresno County Waterworks District No. 18 (14–06–200–5904–LTR1); Fresno Irrigation District (14–06–200–1122A–LTR1); Garfield Water District (14–06–200–9421–LTR1); Gravelly Ford Water District (1–07–20–W0242–LTR1); International Water District (14–06–200–585A–LTR1); Ivanhoe Irrigation District (I75r–1809–LTR1); Lindmore Irrigation District (I75r–1635–LTR1); Lindsay–Strathmore Irrigation District (I75r–1514–LTR1); Lower Tule River Irrigation District (I75r–2771–LTR1); Madera, County of (14–06–200–2406A–LTR1); Madera Irrigation District—Friant Division (I75r–2891–LTR1); Orange Cove, City of (14–06–200–5230–LTR1); Orange Cove Irrigation District (I75r–1672–LTR1); Porterville Irrigation District (I75r–4309–LTR1); Saucelito Irrigation District (I75r–2604–LTR1); Shafter–Wasco Irrigation District (14–06–200–4032–LTR1); Southern San Joaquin Municipal Utility District (I1r–1460–LTR1); Stone Corral Irrigation District (I75r–2555–LTR1); Tea Pot Dome Water District (14–06–200–7430–LTR1); Terra Bella Irrigation District (I75r–2446–LTR1); and Tulare Irrigation District ( I75r–2485–LTR1). These contracts can be found in the Bureau's Water Contracts administrative record. *See* USBR WC AR: 000773, 000172, 025149, 019329, 002192, 025212, 025279, 025341, 002672, 002841, 002974, 003156, 025466, 025587, 004084, 025850, 025913, 025977, 026041, 026106, 026167, 026231, 026297, 026357. Pls.' Brief. at 7.

5. The adjudication of this matter has been made substantially more difficult by the parties' failure to use the same Bates numbers system in their statements of undisputed facts. Plaintiffs and Federal Defendants use the numbers assigned to the documents by FWS and/or NMFS, while the Friant defendants use the numbers assigned by the Bureau. Thus, it is possible that the same documents will be cited differently, depending on how the parties have cited the document in their SUFs.

ment on January 17, 2001. Pls.' SUF 9, citing FWS AR 0823519.

On January 19, 2001, the same day that the FWS BiOp was issued, FWS senior biologist Dr. David Wright e-mailed Michael Fris, another employee at FWS, discussing "possible holes and weaknesses in our crash BO," Pls.' SUF at 11, citing FWS AR 01802983, 018023984, including inadequate time to do a consultation, inadequate biological assessments, a track record of lack of compliance by the Bureau of Reclamation, concern that the contracts are inconsistent with CVPIA, and lack of coordination with NMFS. *Id.* Dr. Wright's supervisor, Michael Thabault, forwarded Dr. Wright's memorandum up the chain of command to Wayne White "in the interest of the deliberative process," and so that he could "be aware of the vulnerabilities before signing" [the biological opinion]. Pls.' SUF 11, citing FWS AR 0823985. That same day, on January 19, 2001, Dr. Wright again wrote his colleague, Michael Fris, and asked him to "slam out the Conclusion section" while he was "polishing Effects." Pls.' SUF 12, citing FWS AR 0823988.

### 2. *ESA Consultation on the Hidden and Buchanan Districts*

Two of the Friant districts have additional contracts with the Bureau for delivery of water from CVP units. Pls.' SUF 13. The contracts are referred to as Chowchilla Water District, Buchanan Unit (Contract # 14–06–200–3844A–LTR1) and the Madera Irrigation District, Hidden Unit (Contract # 14–06–200–4020A–LTR1). *Id.* The Hidden Unit contract provides for delivery of 24,000 acre-feet of water annually from Hensley Lake to Madera Irrigation District, and the Buchanan Unit contract provides for delivery of 24,-000 acre-feet annually from Eastman Lake to Chowchilla Water District. Friant Defs.' SUF 49, citing BORESA 041538. The renewal contracts concerning Hidden

and Buchanan reservoirs were executed on February 14 and 15, 2001.

#### a. *NMFS's Consultation*

The January 5, 2001 formal consultation request to NMFS on the Friant contracts had not encompassed the Hidden and Buchanan contracts. Pls.' SUF 22, citing NMFS AR 000526. Nevertheless, on February 12, 2001, NMFS issued a letter in response to the Bureau's request, that NMFS did, in fact, "consider the effects of the Hidden and Buchanan contracts in the Biological Opinion issued to the Bureau on January 20, 2001." Pls.' SUF 19, citing NMS AR 0008881, *et seq.*, NMFS AR 000915, Pls.' SUF 50, NMFS AR 000884, 000885, 000913, 000915. The Bureau did not request formal Section 7 consultation from NMFS on the Hidden and Buchanan contracts. Pls.' SUF 52, citing NMFS AR 000526–27, 000885, 000881. No biological opinion was ever issued by NMFS on the Buchanan and Hidden units. *Id.*

#### b. *FWS's Consultation*

An internal FWS memorandum noted that a FWS biologist "decided on 1–19–01 to not include Hidden and Buchanan Unit Contracts in the Friant–Cross Valley Opinion due to insufficient time to make the necessary changes in the project description and effects." Pls.' SUF 14, citing FWS AR 09024885–86. After issuance of the FWS 2001 BiOp and NMFS 2001 BiOp, the Bureau notified FWS and NMFS that it had discovered an "administrative oversight" in which the tables provided to the Services as part of the project description for the consultation did not include the Hidden and Buchanan contracts. BORESA 045889, 041752.

On February 1, 2001, the Bureau formally requested consultation with FWS on the Hidden and Buchanan contracts. Pls.' SUF 19, citing FWS AR 09024891. On

February 14, 2001, FWS issued a new biological opinion for the Hidden and Buchanan contracts. Pls.' SUF 16. In an e-mail dated February 2, 2001 FWS employee, Michael Fris, wrote that "I don't think this is a big deal, because I think this opinion is pretty much written up thanks to the Friant opinion." Pls.' SUF 17, citing FWS AR 09025034.

### 3. FWS's and NMFS's 2001 Biological Opinions

### a. The Services' "Adverse Modification" Analysis

### i. NMFS

The entire discussion of the effects and cumulative effects of the long-term Friant contracts in NMFS' January 20, 2001 biological opinion spans three pages. In these pages, NMFS acknowledged the potential impact of Friant diversions on downstream fish, including the endangered Sacramento River winter-run Chinook salmon.

The parties dispute whether NMFS' 2001 biological opinion on the Friant contracts adequately addressed the recovery of winter-run Chinook salmon. Pls.' SUF 21, citing NMFS AR 900–02, Fed. Defs.' Response SUF 25, citing BORESA 041554–55, 029201–03. When the Bureau first attempted to renew the Friant contracts in 1991, it asked NMFS to concur that the contracts were not likely to adversely affect winter-run Chinook salmon. Pls.' SUF 27, citing *NRDC v. Houston,* 146 F.3d 1118, 1123–4, 1126 (9th Cir.1998). By the time the Bureau initiated consultation on the present Friant contracts, NMFS had listed two new threatened species that inhabit the Delta, Central Valley Steelhead and Central Valley spring-run Chinook salmon. Pls.' SUF 30, citing NMFS AR

000892. Although NMFS had begun consultations with the Bureau on CVP's effects on spring-run Chinook salmon and steelhead, those consultations had not been completed as of January 20, 2001. Pl.'s SUF 31, citing NMFS AR 00084.[6]

### ii. FWS

At the time FWS issued its January 19, 2001 biological opinion, FWS had designated critical habitat for at least seven species considered in the 2001 consultation, the California condor, Delta smelt, Fresno kangaroo rat, least Bell's vireo, Little Kern golden trout, Southwestern willow flycatcher, and the Valley elderberry longhorn beetle. Pls.' SUF 24, citing FWS BiOp at 1–8 to –7, 3–23; BORESA 039978–80. FWS's January 19, 2001 biological opinion mentioned "recovery" in connection with its effects analysis for the Delta Smelt, least Bell's vireo, and the Southwestern willow fig catcher. Pls.' SUF 25. The parties dispute whether the FWS's 2001 BiOp drew a conclusion as to whether the Friant contracts, taken together with cumulative effects, would result in adverse modification of the critical habitat of the least Bell's vireo. Pls.' SUF 26, citing FWS BiOp at 3–23 to –24, FWS BiOp at 1–7, 5–7; BORESA 040068–69; BORESA AR 039980, 040128.

### B. THE SERVICES' JEOPARDY ANALYSES

### 1. NMFS

NMFS's Biological Opinion concluded that "the renewal CVP long-term water service and repayment contracts for the twenty-eight Friant Division water contractors and the eight (8) Cross Valley water contractors for a period of 25 years is not likely to jeopardize the continued

---

**6.** NMFS's 2001 BiOp explains that there is an ongoing consultation to update the NMFS 1993 opinion on the CVP/State Water Project, which is anticipated to be completed prior to March 1, 2001. NMFS AR 00084.

existence of winter-run Chinook salmon, spring-run Chinook salmon, or Central Valley steelhead, or result in the destruction or adverse modification of designated critical habitat for these species." Friant Defs.' SUF 29, citing BORESA 041555.

### 2. *FWS*

On January 18, 2001, a meeting occurred between FWS biologists and their field supervisor, Wayne White, among others, where they discussed "status and some outstanding issues relevant to the Friant/Cross Valley long-term contract renewals." Pls.' SUF 34, citing FWS AR 08023904. Dr. David Wright, the field supervisor of the Sacramento FWS office, advised Mr. White, who was in charge of FWS' California and Nevada offices, that this "long-term contract renewal . . . would be a jeopardy on indirect effects." Mr. White rejected Dr. Wright's analysis, however, because consideration of such effects "would be a hard sell outside California." Another FWS biologist, Joy Winckel, asked Mr. White whether they could even consider jeopardy at all. Mr. White stated that it was "too late" to consider jeopardy. The opinion had to be rushed out the following day, Mr. White explained, to "avoid the opinion becoming even weaker under the incoming Bush administration." Pls.' SUF 35, citing FWS AR 08023904.

In order "[t]o reach a no jeopardy conclusion," FWS's January 19, 2001 BiOp on the Friant contracts excluded certain actions which "will require separate determinations regarding their potential effects on threatened and endangered species and critical habitat pursuant to section 7 and/or

section 10 of the ESA." Pls.' SUF 36, citing FWS 080240263.[7] FWS had been concerned with operations and maintenance activities associated with contract deliveries.[8] During the 1991 consultation on the now invalidated Friant long-term renewal contracts, for example, as well as during subsequent consultations on the interim contracts adopted after *NRDC v. Houston,* FWS's biological opinion required the Bureau to commit to preparing guidance on how to conduct operations and maintenance activities so as to minimize endangered species impacts. The Bureau, however, was "behind the date identified in the Interim opinion" in implementing the operation and maintenance plan. Upon completion of consultation on the contracts at issue here, FWS again required the Bureau to commit to completing site-specific operations and management plans within one year of the January 19, 2001 biological opinion. Pls.' SUF 37, citing FWS BiOp 2–38, BORESA 040026.

FWS's January 19, 2001 BiOp recognizes that operations and maintenance activities on Bureau facilities used to deliver Bureau water to the Friant contracts are related to the Friant contracts. Operations and maintenance activities were identified as "requiring section 7 consultation separate from the present opinion." FWS's opinion advised the Bureau to "consider whether it may have a duty to avoid irreversible or irretrievable commitments pending any biological opinion on that 'related action.' " Pls.' SUF 39, citing FWS BiOp at 4–1, BORESA 040104. The FWS biologists who conducted the Friant contract consultation understood that they

---

**7.** FWS's BiOp explains that these related actions include but may not be limited to operations and maintenance activities, water transfers, assignments, and exchanges by Friant and Cross–Valley contractors, including flood flows, and Warren Act contracts for conveyance of non-federal water using federal facilities. FWS BiOp 41, FWS AR 08024103.

**8.** A January 2, 2001 internal FWS memorandum describes two unauthorized riverbed recontouring jobs by the Lower Tule River Irrigation District, in 1999 and 2000, that destroyed at least several hundred elderberry bushes. Pls.' SUF 37, citing FWS AR 08023055.

were not analyzing indirect effects of the Friant contracts, from interrelated operations and maintenance activities. Pls.' SUF 40, citing FWS AR 08023512.[9]

The Friant long-term contracts cumulatively authorized the Bureau to deliver more than 2.1 million acre-feet of water per year, for twenty-five years. Pls.' SUF 41, citing FWS BiOp 2–3, 2–5 to–6 (Table 1.4), USBR ESA AR 039991, 039993–4.[10] The parties dispute the exact amount of water that the BiOps on the Friant contracts actually considered in the consultation. FWS opined that "delivery of full contract quantities is unrealistic and that deliveries will continue to be impacted by existing climate, hydrology, actions and statutes including, but not limited to existing biological opinions, existing implementation of the CVPIA, and conformance and adherence to additional existing State and Federal regulations and guidelines; and socioeconomic factors." Friant Defs.' SUF 13, FWS January 19, 2001 BiOp, BORESA 040104–040105. FWS conducted its analysis under the expectation that water will be delivered to CVP service contractors in quantities that approximate historic deliveries (1988 through 1997) as given in Appendix D of the November 21, 2000 programmatic long-term CVP contracts consultation. Id.

FWS understood when preparing its biological opinion that its assumptions regarding water deliveries were "needed to ... enable use [sic] to get No Jeopardy." Pls.' SUF 45, citing FWS AR 08023997 (e-mail from Michael Hoover to David Wright). In reaching its "no jeopardy"

and "no adverse modification" conclusions, FWS relied on the Bureau's stated commitment, as set forth in the project description of the FWS's biological opinion, to carry out an extensive, thirty-three page list of measures that would mitigate the adverse direct and indirect effects of the Friant contracts. FWS "assumed" that the Bureau would fully and timely carry out these mitigation measures, as a predicate to FWS's "no jeopardy" finding. Pls.' SUF 46, citing FWS BiOp at 2–22 to 2–55, 4–1; BORESA 040010–040043, 040104.

While some progress was made by the Bureau on various commitments to keeping mitigation promises, the Bureau was still in the process of meeting its obligations. Pls.' SUF 48, citing, e.g., BORESA 040017.

## D. OTHER BIOLOGICAL OPINIONS

### 1. *November 2000 NMFS and FWS Biological Opinions*

#### a. *NMFS*

In November 2000, NMFS prepared a document relating to both the CVPIA (Central Valley Project Improvement Act) and the CVP (Central Valley Project), entitled "Programmatic Biological Opinion for the Improvement Act Preferred Alternative and Proposed Record of Decision" ("NMFS Programmatic BO"). The NMFS CVPIA BiOp declared that the CVPIA FPEIS is "a tiered National Environmental Policy Act document that allows for future site-specific NEPA analysis on CVPIA actions," and that "[t]his biological opinion is similarly tiered."[11] Friant

9. Plaintiffs cite an internal FWS memorandum where a FWS biologist expressed concern that addressing operations and maintenance in a separate opinion would limit BOR's ability to condition the contracts (e-mail from David Wright to Joy Winckel).

10. "Full entitlements are 2,115,975 acre-feet for the Friant division and 128,300 acre-feet

for the Cross Valley Division." BORESA 039991, FWS BiOp 2–3.

11. The FWS Opinion states:

This consultation is intended to address, in a comprehensive manner, the numerous and widely varied actions related to implementation of the CVPIA and the continued operation and maintenance of the CVP

Defs.' SUF 7, citing BORESA 29833. The parties dispute whether the FWS and NMFS 2001 BiOps on the Friant Long–Term Contracts were preceded by and "tiered" from eight previous biological opinions. NMFS's programmatic BiOp evaluated the Delta Division operations of the CVP, discussing the Tracey Pumping plant.

### b. *FWS*

In November 2000, FWS prepared a "Biological Opinion" on the Implementation of the CVPIA and Continued Operation of the Maintenance of the CVP. This opinion is colloquially known as the "Mother Opinion." Friant Defs.' SUF 1, citing BORESA 052972–052977. The FWS Mother Opinion explains that "Site specific or tiered consultations following this programmatic consultation will rely on programmatic assumptions made during this consultation process while development and implementation of site specific actions will rely on the direction provided by both consultation processes." Friant Defs.' SUF 4, citing BORESA 052934–052935. Included among the proposed actions upon which the consultation occurred was the "Long–Term Renewal of CVP Water Service Contracts." [12] Identified among contracts to be renewed were the Friant Division contracts. Friant Defs.' SUF 5, citing BORESA 052972–052976.

The FWS Mother Opinion includes discussion of operations and maintenance activities, commitments made by the Bureau regarding operations and maintenance planning, and the direct and indirect effects of operations and maintenance activities of the CVP. Friant Defs.' SUF 32, citing BORESA 052989–052992, 053002–053003, 053053.[13] The Mother Opinion asserts that it considered the "direct and indirect effects of agricultural conversions and related operations" and the "direct and indirect effects of municipal and industrial conversions" facilitated by the CVP. Friant Defs.' SUF 19, citing BORESA 053048–053051. FWS rendered non-jeopardy opinions regarding continued CVP operations, but specifically stated that those opinions were based upon "implementation of and compliance with all of the conservation measures and commitments," and "commitments to uphold ESA by both agencies, combined with implementation ... of programs ...." Friant Defs.' SUF 20, citing BORESA 053068, 039988.

## II.

### ANALYSIS [14]

Plaintiffs challenge various biological opinions issued by the FWS and NMFS

---

that may be undertaken by the service and/or Reclamation. While a number of the actions are clearly interrelated and interdependent, others are not and could be considered as stand alone actions ... the Service and Reclamation have agreed that activities listed in the Project Description would be evaluated as a suite of actions all related in one form or another to the CVP and/or CVPIA. Therefore, this biological opinion addresses the effects upon listed species resulting from implementation of this suite of actions as a whole. Friant Defs.' SUF 3.

12. The Mother Opinion, however, explained that after the negotiations on the renewal were completed, "the renewals will be subject to a separate, tiered analysis that is consistent the NEPA tiering in the PEIS .... The site specific, tiered analysis will address direct and indirect effects of contract renewal." BORESA 052972.

13. Plaintiffs point out that Appendix K from the Mother Opinion defines activities that require further site-specific consultation. BORESA 053423–24.

14. The court has, in the course of this case, repeatedly articulated the standards applicable to summary judgment and nothing would be served by repeating them here.

which preceded the renewal of long-term water contracts in the Friant, Buchanan, and Hidden water units.[15] They contend that Federal defendants failed to complete environmental reviews as required by ESA and that the consulting agencies issued biological opinions which fail to comply with the law.[16] I decide these motions based on the parties' papers, the administrative record lodged with this court, and after oral argument.

## A. STANDARD OF REVIEW

This court is charged with reviewing agency actions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and must be satisfied that the decisions are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nev. Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 716 (9th Cir.1993); 5 U.S.C. § 706(a)(2). The court's review is "narrow" but "searching and careful," *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Review of the issues subject to the

arbitrary and capricious standard examine whether the agencies' decisions are based on a consideration of the relevant factors and whether the agencies articulated a rational connection between the facts found and the decisions made. *Id.* at 378, 109 S.Ct. 1851.

## B. LEGAL FRAMEWORK

For any federal action that may affect a threatened or endangered species or its habitat, the agency contemplating the action, otherwise known as "the action agency" (here, the Bureau of Reclamation), must consult with the appropriate "consulting agency" (here, the FWS and NMFS), for the purpose of ensuring that the federal action is not likely to: (1) jeopardize "the continued existence of" an endangered or threatened species; and (2) that the federal action will not result in the "destruction or adverse modification" of the designated critical habitat of the listed species. 16 U.S.C. § 1536(a)(2).[17]

Typically, the action agency makes a written request to the consulting agency,

---

**15.** Defendants specifically challenge the following biological opinions issued by FWS and NMFS: (1) FWS's January 19, 2001 "Biological Opinion on U.S. Bureau of Reclamation Long Term Contract Renewal of Friant Division and Cross Valley Unit Contracts" ("FWS 2001 BiOp")(BORESA 039974); (2) FWS's February 14, 2001 "Biological Opinion on U.S. of Reclamation Long Term Contract Renewal of Buchanan and Hidden Units Contracts" ("FWS Hidden and Buchanan BiOps") (BORESA 053428); (3) NMFS's January 20, 2001 "Biological Opinion on the Proposed Long–Term Renewal of Central Valley Project Water Service Contracts for the Friant Division and Cross Valley Canal Unit Contractors" ("NMFS 2001 BiOp") (BORESA 041534).

**16.** Plaintiffs previously challenged the renewal of long-term water contracts before this court over one decade ago. BOR first executed long-term forty-year contracts with certain Friant water districts in the middle of the last

century. By the late 1980s, these contracts began to expire. The Bureau then began to issue long-term "renewal" contracts on terms largely unchanged from the original contracts. Plaintiffs alleged that the Bureau failed to complete environmental reviews on these renewal contracts, and filed suit in December 1988. On May 31, 1995, this court ruled that the renewed contracts were executed in violation of ESA. *See* May 31, 1995 Order at 29. Eighteen months later, after extensive briefing on the appropriate remedy for the ESA violations, this court ordered those contracts rescinded. *See* January 16, 1997 Order at 36. The Friant defendants appealed those orders. On June 24, 1998, the Ninth Circuit affirmed this court's finding that the Bureau had violated the ESA and upheld this court's rescission order. *NRDC v. Houston*, 146 F.3d 1118, 1129 (9th Cir.1998).

**17.** These consultations are often referred to as "Section 7 consultations."

50 C.F.R. § 402.14(c), and after formal consultation, the process concludes with the consulting agency issuing a biological opinion. The BiOp must address both the jeopardy and critical habitat prongs of Section 7 by considering the current status of the species, the environmental baseline, the effects of the proposed action, and the cumulative effects of the proposed action. 50 C.F.R. § 402.14(g)(2)-(3). *See generally Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059, 1063–65 (9th Cir.2004). Regardless of whether critical habitat is designated, an agency must consult with the Secretary where an action will "jeopardize the continued existence" of a species. If critical habitat has been designated, ESA imposes an additional consultation requirement where an action will result in the "destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a). If the BiOp concludes that the proposed action is likely to jeopardize a protected species, the agency must modify its proposal according to the service's suggestions or risk being found in violation of the statute. 16 U.S.C. § 1536(b)(3)(a); *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988). Section 7(d) of ESA forbids the "irreversible or irretrievable commitment of resources" during the consultation process.

Plaintiffs challenge the three BiOps under both the jeopardy and critical habitat prongs of Section 7. Below, I address the consulting agencies' analyses of the critical habitat requirement on the Friant units, and then examine their treatment of the jeopardy requirement.[18] This order will then address the agencies' consultation on the Buchanan and Hidden water units.

## C. THE SERVICES' "ADVERSE MODIFICATION OF CRITICAL HABITAT" ANALYSES

An ESA biological opinion must determine whether the federal action will result in the "destruction or adverse modification" of the designated "critical habitat" of the listed species. 16 U.S.C. § 1536(a)(2). Plaintiffs argue that NMFS and FWS failed to properly consider and analyze whether the renewal of the contracts was likely to result in adverse modification of critical habitat for the winter-run Chinook salmon and for other listed species with critical habitat. Before addressing that contention, I discuss a threshold issue, the agencies' interpretation of "adverse modification" pursuant to 50 C.F.R. § 402.02.

### 1. *The Services' Definition of "Destruction or Adverse Modification" under 50 C.F.R. § 402.02 and Gifford Pinchot*

It is undisputed that at the time FWS and NMFS issued their biological opinions in 2001, they applied a definition of "destruction or adverse modification" of critical habitat that the Ninth Circuit has recently held to be invalid.[19] *Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir.2004). The regulatory definition "re-

---

18. The court has examined the February 14, 2001 Hidden and Buchanan FWS biological opinion, and agrees with plaintiffs that they are "materially the same as the FWS' January 19, 2001" biological opinion (on the Friant units), Pls.' Br. at 12. *See* BORESA 053428, *et seq*. Thus, the analysis of the January 19, 2001 BiOp also applies to the February 14, 2001 BiOp.

19. The Services' regulation defined "destruction or adverse modification" as "a direct or indirect alteration" that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical. 50 C.F.R. § 402.02.

quires appreciable diminishment of the critical habitat necessary for survival before the 'destruction or adverse modification' standard could ever be met." *Id.* Put differently, under the regulation "a proposed action 'adversely modifies' critical habitat if, and only if, the value of critical habitat for *survival* is appreciably diminished." *Id.* That understanding, the Circuit held, "reads the 'recovery' goal out of the adverse modification inquiry" and "cannot be right" because the Services would be "obligated to be indifferent to, if not to ignore, the recovery goal of critical habitat." *Id.* at 1070 (citing *N.M. Cattle Growers Ass'n v. United States Fish and Wildlife Serv.,* 248 F.3d 1277, 1283 & n. 2 (10th Cir.2001) and *Sierra Club v. United States Fish and Wildlife Serv.,* 245 F.3d 434, 441–42 (5th Cir. 2001)). Such a reading, the court held, "contradicts Congress's express command" and constitutes "a failure of the regulation to implement Congressional will." *Id.* at 1069–70.[20] In sum, the Circuit held that the Services must consider both species' survival and recovery in considering whether the proposed action ad-

versely modifies critical habitat. *Id.* at 1070.

The Circuit also explained that when analyzing the BiOps' critical habitat analysis, courts "must presume, unless rebutted by evidence in the record, that the [Services] followed [their] definition of adverse modification and thereby ignored the evaluation of whether adequate critical habitat would remain to ensure species recovery." *Id.* at 1070. The Government could also show "harmless error" by proving that, even if it ignored recovery on the record by following its regulation, it did not affect the result of the critical habitat analysis.[21]

Plaintiffs assert that the Services' failed to consider whether the contracts were likely to result in adverse effects on critical habitat for winter-run Chinook, and other listed species with designated critical habitat. Defendants contend that they did, in fact, consider both recovery and survival in their biological opinions. Under *Gifford Pinchot,* this court must presume that the Services followed their now-invalid regulation and examine whether defendants can bear the burden of showing that the record rebuts such a presumption for each of the

---

**20.** The Ninth Circuit elaborated that such a reading would allow the Services to authorize the "complete elimination of critical habitat necessary only for recovery, and so long as the smaller amount of critical habitat necessary for survival is not appreciably diminished", then "no destruction or adverse modification" has taken place. 378 F.3d at 1070.

**21.** Nonetheless, the Circuit concluded that such an argument is disfavored because the Services (and in this case, the court) would be required to craft a hypothetical critical habitat analysis that takes into account species recovery in order to compare process and outcome to the non-recovery analysis in the BiOps. *Id.* at 1072, n. 8 (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Thankfully, the court need not address this issue because neither Federal nor Friant defendants have made such an argument.

In *Gifford Pinchot,* defendants argued that they implicitly considered recovery in their critical habitat analysis, thus ignoring their own regulation. Thus, as the Ninth Circuit explained, Federal defendants did not argue that they relied on the regulation and that the reliance was harmless. Instead, the agencies asserted a much more nuanced point, that consideration of recovery was implicit in their critical habitat analysis, and that FWS met the ESA standards. Based on their papers and oral argument, it appears to the court that in the instant case Federal defendants assert a similar position, i.e., that they implicitly considered recovery and survival in their biological opinions, and that however this court interprets the adverse modification regulatory definition, the Services met the appropriate standard.

listed species. Put differently, but to the same effect, the question is whether defendants can demonstrate that the record supports a conclusion that NMFS analyzed species recovery or conservation in the context of critical habitat and ignored their own regulation. *Gifford Pinchot,* 378 F.3d at 1075.

### 2. *Winter-run Chinook Salmon (Plaintiffs' Sixth Claim)*

■ Friant defendants maintain that *Gifford Pinchot* does not apply because NMFS has withdrawn its critical habitat designation for winter-run Chinook and because the Friant contracts do not adversely modify critical habitat of winter-run Chinook. The administrative record does not support the argument.

NMFS first designated critical habitat for winter-run Chinook in 1993, 58 Fed. Reg. 33212 (June 16, 1993), and that designation remains valid. As plaintiffs note, a BiOp issued by NMFS on October 22, 2004 confirms that critical habitat was, and remains, designated for winter-run Chinook salmon. *See, e.g.,* Request for Judicial Notice in Supp. of Opp. of Def.-Ints. SLDMWA and Tehama–Colusa Canal Authority to Mot. by NRDC, et al. for Summ. Adj. (Nov. 19, 2004), Ex. B at 48 (describing current critical habitat designation for winter-run Chinook).[22] Friant defendants assert that NMFS vacated its designation by consent decree, citing *Ass'n of California Water Agencies v. Evans,* 386 F.3d 879, 881 (9th Cir.2004) and *Nat'l Ass'n of Home Builders v. Evans,* 2002 WL 1205743 (D.D.C.2002). Both of these cases

challenged 65 Fed.Reg. 7764 (Feb. 16, 2000), which designated critical habitat for nineteen listed populations of steelhead trout and salmon, not including the winter-run Chinook.[23]

Alternatively, Friant defendants argue that the renewal of the contracts has no effect on the critical habitat of the winter-run Chinook. They inappropriately extract one sentence from the "effects" discussion in NMFS' 2001 BiOp which states that "[s]ince winter-run chinook and spring-run chinook are not present in the San Joaquin River system, they will not be affected by these circumstances." "[T]hese circumstances" refer to the direct effects of Friant Dam's diversion on the winter-run chinook. BORESA 041554. Friant defendants contend that it is "speculation that [winter-run] chinook might return to the upper San Joaquin River to spawn at some future date, so that the continuation of present water diversions might 'adversely affect' their potential future habitat." Friant Def.'s Br. at 13, n. 7. I cannot agree.

While it is true that NMFS' 2001 BiOp observes that winter-run chinook salmon "no longer occur within the San Joaquin Basin," the 2001 BiOp also states that "[v]iable populations of these listed species currently spawn and rear in accessible river reaches." Further, "[d]esignated critical habitat" for winter-run chinook includes "all river reaches and estuarine areas of the Sacramento–San Joaquin Delta."[24] BORESA 041550. According to the 2001 BiOp, "[t]he essential elements of designated critical habitat [for winter-run

---

**22.** NMFS's website also states that the critical habitat designated for winter-run chinook salmon remains valid. *See* http://www.swr.nmfs.noaa.gov (viewed on April 3, 2005).

**23.** The nineteen salmon and steelhead species at issue included the California Central Valley spring-run chinook and the California coastal

chinook, but did not include the winter-run chinook. *See* Fed.Reg. 7764.

**24.** Thus, NMFS's analysis directly contradicts' Friant defendants' assertion that "critical habitat for winter-run salmon was only designated on the Sacramento River." Friant Defs.' Br. at 16.

chinook] are the water, substrate, and adjacent riparian areas." *Id.*

Friant defendants' argument that the contracts do not adversely modify the critical habitat of winter-run chinook must be rejected because the Services are required to analyze indirect effects caused or induced by the action that are "reasonably certain to occur," in addition to the direct effects. 50 C.F.R. § 402.02. As plaintiffs note, NMFS concluded that there would be "[p]otential indirect effects of the proposed contract renewals" on the critical habitat of winter-run chinook, including changes in surface water storage, changes in stream flows in the lower San Joaquin River, and changes in flows through the Delta and/or other CVP facilities. *Id.* NMFS explained that "[f]low changes within the Delta ... may also exacerbate the conditions that entrain [winter-run] juveniles ... into the southern Delta and the pumping plants of the CVP and State Water Project." *Id.* Contrary to Friant defendants' assertions, NMFS's analysis in the 2001 BiOp concluded that winter-run chinook would be impacted through indirect effects of the proposed action.[25] Federal defendants were, as they recognize, Fed. Defs.' Br. at 12, required to assess the impact of the contract renewal on habitat critical to recovery of the winter-run chinook salmon.

Both Friant and Federal defendants assert that the agency did, in fact, ignore the now-invalidated regulations and adequately considered recovery of winter-run chinook salmon in the context of their critical habitat. Friant Defs.' Br. at 13–14; Fed Defs.' Br. at 17–18. I cannot agree.

Federal defendants assert that this court must consider other documents besides the NMFS's 2001 BiOp because the BiOp was "tiered off" these documents, "resulting in a thorough biological review ...." Fed. Defs.' Br. at 6, 12. Federal defendants assert that NMFS considered long-term renewal of the CVP water service contracts in its November 14, 2000 Programmatic BiOp,[26] and that this, along with the passages cited from the 2001 BiOp show that federal defendants "properly took recovery into account." Fed. Defs.' Br. at 14.

■ In *Gifford Pinchot,* the Ninth Circuit, for the first time, approved of "tiering," or "programmatic environmental analysis supplemented by later project-specific environmental analysis" in the

---

**25.** This court has also previously recognized that indirect effects, including "[t]he pumping and reverse flows associated with [water exports of Delta water through the Delta–Mendota Canal], may affect [winter-run] species outside the Friant service area." *See* May 31, 1995 Order at 19.

**26.** In 1992, Congress enacted the Central Valley Project Improvement Act ("the Act") as Title XXXIV of the Reclamation Projects Authorization and Adjustment Act of 1992, Pub.L. No. 102–575, 106 Stat. 4600, 4706–31 (1992); the law took effect on October 31 of the same year. CVPIA seeks to achieve "a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors." Section 3402(f).

Section 3406(b)(2) of the CVPIA directs the Secretary to dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento–San Joaquin Delta Estuary; and to help meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act. Under the CVPIA, defendants were charged with issuing BiOps and EIS statements which comply with ESA and NEPA.

ESA context. 378 F.3d at 1067–68, citing *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir.1994)(approving of tiering in the NEPA context). It held that the defendants there could tier to the National Forest Plan because it was a "unique land-management plan" that had already been approved by this court and that it was "hesitant to fault the agency for relying on it in the context of this case." *Id.* Arguably, the Ninth Circuit took the unusual step of approving tiered ESA analysis in *Gifford Pinchot* because the Forest Plan which served as the programmatic opinion was not ordinary, but a particularly thorough and complex one which survived a legal challenge. *Id.* at 1067–68. If so, the holding was a narrow one, not applicable to all ESA cases.[27] Because this court is uncertain about the scope of *Gifford Pinchot*, and discretion being the better part of valor, the court will proceed to consider whether tiering aids defendants in the matter at bar.

Defendants urge the court to look at other documents and BiOps, which they argue, shows that they fulfilled their ESA obligations. Both Friant and Federal defendants cite to the agencies' 2000 programmatic BiOp on CVPIA to argue that the 2000 programmatic BiOp was supplemented by the 2001 BiOps, which served as project-specific environmental analysis. As I now explain, even with this tiered consultation, defendants have not met their obligations under ESA.

With regard to the winter-run chinook and critical habitat, Federal defendants assert that NMFS initially considered critical habitat in the 2000 Programmatic BiOp, but admit that the BiOp stated that the long-term contract renewals would be

---

**27.** This court is bound by the Ninth Circuit's holding, but must confess to reservations about extending "tiered analysis" to ESA. Tiered consultation, while discussed in the implementing regulations of NEPA, is not described anywhere in ESA or its implementing regulations. Allowing such a process in a procedural statute which requires no particular result makes staged analysis acceptable. ESA, however, is an action-forcing statute, turning on identified prohibited consequences of government action, both direct, indirect, and interrelated effects. Tiering, however, i.e., staged analysis, will tend to obscure the ability of the agency to identify the direct and indirect consequences of particular action, and thus tend to obscure when government action is prohibited. Moreover, it is established that segmented analysis is prohibited in an ESA context. *Conner v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir.1988)(holding that FWS was required to consider consequences of all stages of oil and gas activity in rendering a biological opinion). The difficulty in distinguishing between prohibited segmentation, and permitted tiering, was illustrated during oral argument relative to the motion at bar.

Unfortunately, the *Gifford Pinchot* court failed to explain how a "tiered analysis" will be applied in an ESA case, and many questions are unanswered. The court notes that only two other cases have ever discussed a "tiered" analysis in the ESA context, *Buckeye Forest Council v. United States Forest Serv.*, 337 F.Supp.2d 1030, 1036 (S.D.Ohio 2004)(concluding that it is not clear that tiered consultation fulfills defendants' ESA obligations) and *Pacific Coast Fed'n of Fishermen's Ass'n's v. Nat'l Marine Fisheries*, No. 97–CV–775, 1998 WL 1988556 (W.D.Wash. May 29, 1998)(applying tiered analysis). Given that the *Gifford Pinchot* court cited a NEPA case in its approval of "tiered analysis," this court will assume that tiered analysis under ESA will be conducted in a manner analogous to that conducted under NEPA. In that regard, NEPA's regulations describe "tiering" as "refer[ring] to the coverage of general matters in broader environmental impact statements (such as a national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basin-wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

subject to a separate, tiered analysis.[28] Fed. Defs.' Br. at 12. There is no mention of, much less extensive discussion of, "recovery" in this passage. Clearly, it is insufficient to overcome the Ninth Circuit's presumption.

In addition to citing the passage from the 2000 BiOp, defendants attempt to overcome *Gifford Pinchot's* presumption by referencing a section of NMFS's 2001 BiOp which discusses alleged improvements in the environmental baseline.[29] While this section of the BiOp mentions "improving habitat" and "restoration," it is clear that NMFS's discussion of improving habitat occurs in the context of the environmental baseline, rather than in the context of protection of habitat critical for the species' recovery.[30] The Services, however, must analyze "recovery in the context of critical habitat, the sense in which recovery evaluation is required by the ESA," rather than in another context. *Gifford Pinchot,* 378 F.3d at 1074 (rejecting discussion of "recovery" as it is "promoted by the [National Forest Plan]," a comprehensive programmatic BiOp). The Court explained that there must be "discussion of the specific impact" of the proposed action—here the contract renewals—on critical habitat and recovery of the species. It emphasized that this distinction is important, especially "when considered in the context of the agency's regulation and the presumption of regularity."

28. The passage that Federal defendants cite to in NMFS's November 14, 2000 programmatic BiOp explains that "the proposed implementation of the CVPIA ... are anticipated to beneficially affect Sacramento River winter-run chinook salmon, Central Valley spring-run chinook salmon, Central Valley steelhead, and their designated critical habitat." *See* BORESA 029586. The BiOp also explicitly states that "new CVPIA project actions which may affect listed Central Valley anadromous salmonids or critical habitats will be addressed through future individual section 7 consultations." *Id.*

29. The NMFS BiOp states that:
There also has been and will continue to be improvements in the environmental baseline as a result of implementation of CVPIA anadromous fisheries restoration plan and (b)(2) provision. Also implementation of CALFED's ecosystem restoration program and environmental water account have improved the environmental baseline by improving habitat, increasing habitat, increasing survival of juvenile salmon and steelhead, and providing tools to minimize the direct and indirect effects of the delta pumping facilities. This improvement in the environmental base line increases the resiliency of the listed salmon populations to the effect of deliveries pursuant to these contracts and provides resources to provide habitat for spawning and rearing of steelhead in the Stanislaus and Tuolumne Rivers, despite the potential for reduction in flow from Friant to increase demands on these Rivers for contributions to pulse flows.
BORESA 041555.

30. The environmental baseline for Section 7 consultation purposes is defined as follows:
The environmental baseline includes the past and present impacts of all federal, state, or private actions and other human activities in the action area, the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of state or private actions which are contemporaneous with the consultation in process.
50 C.F.R. § 402.02.
In other words, the environmental baseline is a "snapshot in time," which allows agencies to understand existing conditions before they consider the effects of a proposed action on those conditions. *See* Tony A. Sullins, *ESA Endangered Species Act,* Basic Practice Series, 2001 (American Bar Association Publishing), at 68–69. As plaintiffs explain, NMFS's BiOp contains no discussion of how and whether these improvements in the baseline affect the value of critical habitat for recovery. Pls.' Br. at 21. Further, as plaintiffs note, a listed species may experience improvements in the environmental baseline and still not recover. *See* 16 U.S.C. § 1532(3) ("recovery" means ESA protections are "no longer necessary").

Federal defendants also point to a passage discussing the indirect effects, including reverse flows and cross delta transport of water, of the contract renewals on the winter-run chinook. *See* BORESA 041554. Nowhere in this passage, however, does NMFS discuss or even mention recovery of winter-run chinook or the contract renewals' impact on critical habitat. I conclude that the defendants have not borne the burden of demonstrating that its reliance on the erroneous regulatory definition of "adverse modification" was harmless. The critical habitat analysis of the winter-run chinook salmon is therefore fatally flawed.

### 3. *Listed Terrestrial and Freshwater Species' Recovery (Plaintiffs' Fifth Claim)*

It is undisputed that, at the time of the consultation at issue, FWS had designated critical habitat for at least seven species, the California condor, Delta smelt, Fresno kangaroo rat, least Bell's vireo, Little Kern golden trout, Southwestern willow flycatcher, and Valley elderberry longhorn beetle. BORESA 039978–80. Plaintiffs contend that under *Gifford Pinchot*, defendants' analysis of adverse modification of critical habitat for these species was improper. I now address defendants' various arguments in opposition to plaintiffs' contention.

As Friant defendants maintain, plaintiffs failed to provide the 60–day notice of ESA violation as to the California condor, the least Bell's vireo, and the Southwestern willow flycatcher. Accordingly, they argue, a condition precedent to suit has not been fulfilled.

Section 11(g) of ESA permits citizens suits to enforce compliance with the Act. 16 U.S.C. § 1540(g). Before such a suit, however, plaintiff must give the Secretary of the Interior and any alleged violators written notice of intent to sue sixty days prior to filing. This requirement is jurisdictional. *Save the Yaak Comm. v. Block,* 840 F.2d 714, 721 (9th Cir.1988). As just noted, plaintiffs here did not do so as to certain species. The question, however, is whether this aspect of plaintiffs' suit is properly viewed as a citizen suit.

In *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), the Supreme Court held that suits against the Secretary of the Interior, acting in his capacity as Administrator of ESA, which challenge the adequacy of biological opinions are not necessarily citizen suits under 11(g) of the Act. Rather, the Court held, such claims could be pled under the Administrative Procedure Act, which authorizes courts to set aside agency actions found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Id.* at 177, 117 S.Ct. 1154.

█ In conformance with the *Bennett* holding, the Ninth Circuit has instructed that so long as it is properly pled under the APA, challenges to the adequacy of biological opinions can be pursued notwithstanding a failure to meet the sixty-day notice requirement. *American Rivers v. Nat'l Marine Fisheries Serv.,* 126 F.3d 1118, 1124 (9th Cir.1997). Plaintiffs have pled both APA and ESA claims against the agencies relative to the asserted deficiencies of the BiOps, and thus the court has jurisdiction to consider any claims that those biological opinions are inadequate.[31]

---

**31.** Once again, this court is perplexed by a holding of courts by which it is bound. The APA provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court." 5 U.S.C.

§ 701(a). On the face of it, ESA's citizen suit provisions provide an adequate remedy and thus would appear to preclude suit under the APA. *See Middlesex County Sewage Authority v. National Sea Clammers Association,* 453

As noted, FWS designated critical habitat for at least seven species considered in this consultation. BORESA 039978–80. Plaintiffs contend that defendants summarily concluded that the proposed action would not "adversely modify" critical habitat without considering recovery, or did not come to any conclusion as to the species.[32]

Federal defendants assert that the designated critical habitat was not within the action area encompassed by the consultation and so it was not affected by the proposed action. Fed. Defs.' Br. at 14. They cite to various passages in the 2001 BiOp which they assert shows that these species' "critical habitat is not within the action area," and thus, they contend, FWS's "no adverse modification" conclusion was "reasonable." *Id.* at 14–15. I cannot agree.

I begin by noting that defendants' argument that the contract renewals would have no effect on critical habitat because the habitat lies outside of the Friant contract service areas is undermined by the BiOp. FWS explained there that the contracts' impact extends beyond the contract area by virtue of both direct and indirect effects.[33] Pls.' Br. at 24. Defendants' argument fails for yet another reason.

In those cases where the FWS articulated a reason for its conclusion, it did not articulate Federal defendants' litigation position as the reason why it determined that some of these species would not be adversely affected.[34] Put bluntly, defendant's litigation position is besides the point. The question is whether the articulated reasons in the record demonstrate that FWS' decisions were based on a consideration of the relevant factors, and whether FWS articulated a rational connection between the facts found and the decisions. *Nev. Land Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 716 (9th Cir.1993).

*Gifford Pinchot* made clear that in considering whether the proposed action adversely modifies critical habitat, FWS must consider both the species' survival and recovery. Thus, as with the spring-run chinook salmon, this court must determine whether FWS ignored its own regulation and considered both recovery and survival in its adverse modification analysis for each species. Below, the court does so for each of the listed species with critical habitat.

### a. *California Condor*

■ FWS concluded that the proposed action would not adversely modify the critical habitat of the California Condor, even though there is scant discussion of the condor's habitat. The BiOp notes that the decline of condor population is "attributed to human persecution, pesticide use, lead poisoning, and habitat loss." BORESA 040050–51. The BiOp, however, appears to contain no discussion whatever of the effect of the contract renewal on "critical habitat," much less mention of recovery or conservation. Defendants insist that because the condor's habitat is not within the action area it is not affected negatively by the proposed action. Again, if defendants'

---

U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

**32.** As plaintiffs point out, FWS did not even reach an adverse modification conclusion as to the Least Bell's Vireo. The court's review of the record supports this allegation, and it also appears that FWS failed to reach a conclusion on adverse modification as to the Little Kern Golden Trout.

**33.** For ESA Section 7 purposes, the agencies must examine both the "direct" and "indirect" effects." 50 C.F.R. § 402.02.

**34.** In many cases, the agency did not articulate any reason for its conclusion.

litigation position was the basis for FWS determination the agency was required to say so in the BiOp, and support that reasoning with a meaningful analysis. The court "cannot infer that analysis was conducted but not described in the BiOp." *Gifford Pinchot,* 378 F.3d at 1074.

### b. *Delta Smelt*

■ Plaintiffs admit that FWS did discuss "recovery" in connection with its effects analysis for the Delta smelt, but they argue that the discussion is inadequate. In light of *Gifford Pinchot,* the court must agree.

The BiOp states that the "renewal of contract [sic] would also adversely impact" the Delta smelt, and although the contracts would "slow down" the Delta smelt's recovery, certain unspecified "commitments" made by the Bureau in the context of an earlier consultation on CVP operations would allow "eventual" recovery of the smelt. BORESA 040125. Although, as plaintiffs concede, this is the most in-depth analysis provided by FWS as to any of the listed species with designated critical habitat, the discussion is insufficient for several reasons.

I begin by noting that while the BiOp acknowledges that the contracts will slow down recovery of the smelt, there is no connection drawn between this adverse impact and its ramifications on the critical habitat of the species. Moreover, as plaintiffs assert, the analysis must not focus on whether eventual recovery is possible, but whether the value of the habitat is "diminishe[d]" for a species' recovery. 50 C.F.R. § 402.02. Finally, FWS's BiOp offers no factual support for its contention that recovery remains possible. Under the APA,

defendants must make a connection between the facts found and conclusion drawn. There are no facts provided for the assertion that recovery is possible. In sum, the BiOp is simply inadequate by any measure.

### c. *Fresno Kangaroo Rat*

■ Federal defendants argue that FWS has met its burden as to the Fresno kangaroo rat because the BiOp states that the Fresno kangaroo rat's recovery was discussed in the Upland Recovery Plan. BORESA 040059. The parties did not submit the Upland Recovery Plan for the court's consideration (or, at the very least, it was not easily found by the court)—thus, it is unclear what the Upland Recovery Plan actually discussed.[35] Moreover, even if the plan were submitted and it had some in depth discussion as to the kangaroo rat, this would be insufficient to meet ESA's requirements because FWS would need to draw a connection between the Upland Recovery Plan and the adverse modification standard within the four corners of the BiOp.

The court does note that "critical habitat" is mentioned with respect to the Fresno kangaroo rat. The BiOp states that "[c]ritical habitat designated for the species lies about 7 miles west of Fresno ID," and that "[a]ppropriate habitat management of protected lands . . . is also urgently needed." BORESA 040117. Although "critical habitat" is mentioned, it is discussed in a more general context—on measures to improve the species's state over all—and thus the FWS did not address the contract renewal's "specific impact" on the Fresno kangaroo's critical habitat and its recovery, as *Gifford Pinchot* requires. *See*

---

**35.** The massive administrative record required the court to warn the parties that a reference to a document which does not contain a citation to that record will be treated as an admission that the document is not contained within that record. As the Seventh Circuit has aptly remarked " [j]udges are not like pigs, hunting for [buried] truffles . . . ." *United States v. Dunkel,* 927 F.2d 955–56 (7th Cir.1991).

378 F.3d at 1074. Indeed, it appears that the "proposed contract renewal" is not even mentioned in the discussion of this species. Common sense as well as binding precedent dictates that "even the mention of 'recovery' does not indicate analysis of recovery in the context of critical habitat." *Id.* at 1074. I conclude that FWS has not shown that it ignored its unlawful regulatory definition in its discussion of the Fresno kangaroo rat.

### d. *Little Kern Golden Trout and Least Bell's Vireo*

 Beyond explaining where the Little Kern Golden Trout's critical habitat is located, *see* BORESA 040071, the only other mention of the species in the entire BiOp is where FWS admits that it "has no information on possible effects from pesticide drift on the Little Kern River golden trout," BORESA 040120. This one mention insufficiently meets *Gifford Pinchot*'s mandate that the BiOp must discuss the federal action's impact on the species' recovery.

 As for the least Bell's vireo, the BiOp explains that "the least Bell's vireo has sufficient populations in their southern range to sustain the species in the foreseeable future," and that "restoration of riparian habitat in the San Joaquin Valley was identified as a critical task to recovery." There is no further analysis of these species. Although "recovery" is mentioned in one sentence in the context of critical habitat as to the least Bell's vireo, that is hardly sufficient to rebut the presumption that FWS ignored its adverse modification regulation. Moreover, even if the refer-

ence were somehow sufficient, FWS failed to draw any conclusion as to adverse modification for the least Bell's vireo even though the BiOp acknowledges that critical habitat was designated for the species. It is not surprising that with the complete absence of analysis for the Little Kern golden trout, FWS also failed to reach a conclusion as to adverse modification for the Little Kern Golden trout, even though it was listed as a species with a critical habitat designation.[36] BORESA 039979.

### e. *Southwestern Willow Flycatcher & Valley Elderberry Longhorn Beetle*

 FWS concluded that the renewal of the contracts would not adversely modify the critical habitat of the southwestern willow flycatcher and the valley elderberry longhorn beetle. BORESA 040128. Defendants assert that FWS did not have to engage in the required adverse modification analysis set forth in *Gifford Pinchot* because these two species' habitat were outside the contract service areas. As discussed above, this argument fails. Again, even if this contention represented a viable defense, the BiOp was required to contain a rational connection between such a conclusion and the facts it relied upon. It did not and, as noted, defendants cannot now make a post-hoc connection for FWS. *Gifford Pinchot*, 378 F.3d at 1074.

The court has independently examined the BiOp and although FWS did mention "recovery" and "critical habitat" as it relates to these two species, it failed to discuss recovery in the critical habitat context, as required under *Gifford Pinchot.* The BiOp notes that "restoration of ripari-

---

**36.** The section of the opinion that articulated conclusions as to the critical habitat of the other species does not mention the Little Kern Golden Trout or the Least Bell's Vireo. BORESA 040128. It might be argued that FWS concluded that there was no adverse modification through its silence, a conclusion this court may not draw. "We cannot infer an agency's reasoning from mere silence," that "in considering the BiOps, we may only rely on what the agency said in the record to determine what the agency decided and why." *Gifford Pinchot*, 378 F.3d at 1072 (citing *Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994)).

an habitat along the Central valley" would be "critical to the recovery of these species." BORESA 040125. At best, it may be said that "recovery" is discussed in a very general way but FWS failed to analyze how the contract renewals would actually impact the species' critical habitat.[37]

In sum, as with the critical habitat analysis for the winter-run chinook salmon, the critical habitat analyses as to the other listed species is insufficient. Given the failure of the record to rebut the presumption that the Services relied on an invalid regulation, I conclude that the NMFS and FWS 2001 BiOps were arbitrary and capricious because they failed to adequately discuss the "adverse modification" prong required under the Endangered Species Act.

## C. THE AGENCIES'S JEOPARDY ANALYSIS

In addition to challenging the consulting agencies' critical habitat analysis, plaintiffs also object to their jeopardy analyses on a number of grounds. I turn to those contentions.

Section 7(a)(2) of ESA, 16 U.S.A. § 1536(a)(2), requires that the Secretary of the Interior ensure that an action of a federal agency is not likely to jeopardize the continued existence of any threatened or endangered species.[38] Section 7(b) sets out a process of consultation requiring the agency with jurisdiction over the protected species to issue to the Secretary a "biological opinion" evaluating the nature and extent of jeopardy posed to that species by the action, 16 U.S.C. § 1536(b), after the action agency provides the Secretary with "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). If the biological opinion concludes that the proposed action is likely to jeopardize a protected species, the action agency must modify its proposal.

### 1. The Services' Effects Analysis (Plaintiffs' Fifth Claim)

Plaintiffs' first contention is that FWS failed to consider all of the effects of the renewed contracts. They maintain that FWS failed to consider the effects of interrelated and interdependent operations and maintenance activities, and that it failed to render a BiOP on the effects of water delivery amounts actually authorized by the water contracts.

### a. Effects of Interrelated and Interdependent Operations and Maintenance

In fulfilling its interagency consultation obligations under § 7 of the ESA, the consulting agency must consider the "entire agency action." *Conner v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir.1988). This includes the effects of the federal action along with the impact of "interrelated and interdependent" actions. 50 C.F.R. § 402.02(d).[39] The test for interrelated or

---

**37.** Friant defendants urge this court to consider FWS's 2000 programmatic BiOp for the CVPIA where FWS explained that "[t]hus, restoration of riparian habitat along the Central Valley, their historical habitat, is critical to the recovery of these species." Assuming arguendo that a tiered analysis under these circumstances is appropriate, the language from the 2000 BiOp failed to discuss recovery in the context of the proposed action's effects on the species' critical habitat, as *Gifford Pinchot* requires.

**38.** " 'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers or distribution of that species." Interagency Cooperation—Endangered Species Act of 1973, as amended, 51 Fed.Reg. 19,958 (1986)(codified at 50 C.F.R. § 402.02) (1986).

**39.** "Effects of the action" refers to direct and indirect effects of an action on the species or critical habitat, together with the effects of

interdependent effects is "but for" causation, *i.e.*, but for the proposed action, would the other action occur. 51 Fed.Reg. 19932 (1986); *Sierra Club v. Marsh*, 816 F.2d 1376, 1387 (9th Cir.1987).

In *Conner*, the Circuit explained that FWS was required to consider the consequences of all stages of oil and gas activity in rendering a BiOP. 848 F.2d at 1453–54. The court concluded that FWS's decision to utilize "incremental-step consultation" was a breach of its duty since such an approach "did not consider all phases of the agency action." *Id.* at 1453. The court emphasized that "agency action" is to be interpreted "broadly," because "[c]aution can only be exercised if the agency takes a look at all the possible ramifications of the agency action." *Id.*

 Here, plaintiffs contend that FWS excluded consideration of interrelated and interdependent operations and maintenance activities, despite the subject action being part of a larger agency action. Plaintiffs observe that FWS's BiOp identifies thirteen activities that were excluded from the consultation which, they assert, may adversely impact listed species and their habitats. Pls.' Br. at 30–31, citing BORESA 039977. The court finds that the record supports the conclusion that FWS unlawfully segmented its consultation.

The 2001 BiOp acknowledges that the "no jeopardy opinion" did not consider "Operation and Maintenance on Federal and District lands used to convey CVP water" and "Operation and Maintenance Plans." BORESA 039977. These actions, it asserted, "will require separate determinations regarding their potential effects on threatened and endangered species and critical habitat pursuant to section 7 . . . ." *Id.* In the "commitments" section of the BiOp, where FWS explained the measures that it assumed would be "fully implemented," the BiOp acknowledged that operation and maintenance activities "have been addressed using a phased approach." [40] In making this commitment to address operation and maintenance activities, FWS acknowledges the potential impacts of these activities on species. (The BiOp provides that "phase II" was dedicated to addressing "sensitive sites" and the creation of measures to "avoid adverse impact to those species." *Id.*). As I now explain, however, the record also demonstrates that operations and maintenance activities were interrelated and interdependent actions which had the potential to adversely impact protected species, and thus should have been included in the consultation.

The BiOp recognizes that operation and maintenance of canals is a part of the agency action because it is part of the water delivery process. *See* USBR ESA

---

other activities that are interrelated or independent with that action, that will be added to the environmental baseline. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration. 50 C.F.R. § 402.02.

**40.** FWS explained that "phase I" consisted of "procedures which are to be followed on

United States lands administered by Reclamation," that "phase II" "addresses the identification of sensitive sites and the creation of site-specific measures to avoid adverse impact to those species," and that "phase III . . . establish[ed] Integrated Pest Management procedures and the implementation of erosion control plans." BORESA 040027. The schedule for beginning implementation of phase I was three months following the date of the Friant opinion, and phase II and III were to begin by the end of 2001. *Id.* FWS claimed that Operations and Maintenance Manuals would be distributed to Districts "within 1 year of this opinion." *Id.*

AR 039981 (water for the Friant Division is impounded behind Friant Dam and then "released to the 152–mile long [Friant Kern Canal] which flows south and to the 36–mile long [Mader Canal] which flows north"). FWS AR 08022253 (Bureau's Biological Assessment on Long–Term Contract Renewal states that study area for Section 7 consultation includes "Friant–Kern Canal, and the Madera Canal"). In a memorandum from Laura Allen, Deputy Regional Environmental Office, to Field Supervisor, U.S. Fish & Wildlife Service (November 25, 2002), where the Bureau requested consultation on implementing an operations and maintenance plan committed to in the 2001 FWS BiOp, "operations and maintenance of facilities" was described as:

> ... functioning to protect the integrity of the canal and distribution systems so that the structures may operate efficiently and safely. Routine maintenance activities of the canal rights-of-way include, but are not limited to, filling erosion gullies and holes, use of herbicides, and use of rodenticides to prevent damaging burrowing activity by ground squirrels. Adverse impacts to listed species can also be caused by some of these activities if they are not performed

properly with environmental concerns taken into consideration.

Exhibit 3 to Pls.' Motion to Augment Record (Nov. 19, 2004).[41]

Because the delivery of water under the contracts cannot be accomplished without the use of canals, operations and maintenance activities are "interrelated actions," or actions which are part of a larger action and depend on the larger action for their justification. 50 C.F.R. § 402.02. "ESA requires that the biological opinion detail how the agency action affects the species or its critical habitat." *Conner*, 848 F.2d at 1453 (internal quotation omitted). The impact of operations and maintenance activities—such as construction, earth moving, erosion control, and pesticide control—have far-reaching and adverse consequences for protected species.[42] FWS failed to comply with ESA by not including in its BiOp how operations and maintenance activities affect species and its critical habitat.

Federal defendants contend that FWS complied with ESA and that the plaintiffs' argument is a "red herring" because they have completed four O & M manuals, which provide the framework for the Bureau and contractors to conduct future

---

**41.** Friant defendants argue that this record is irrelevant because it describes "the Field Operations Manual developed by the South Central California Area Office (SCAAO) of the Bureau of Reclamation" and not "the operation and maintenance of the Friant–Kern Canal or the Madera Canal." They appear to be in error. SCAAO includes the Central Valley Project facilities (including the Madera Canal and the Friant–Kern Canal), the Cachuma Project, Santa Maria Project, and the Ventura River Project. *See* Board of Reclamation Website, *available at* http://www.usbr.gov/mp/area_offices.html (viewed on April 5, 2005).

Clearly, the "Field Operations Manual" is relevant in considering the potential impacts of Operations and Maintenance activities because it lays out the potential impact of such

activities and is "intended for use by Reclamation field staff and for entities contracted to protect and maintain Reclamation facilities."

**42.** According to the operations and maintenance manual, "[h]erbicide treatment of plants that provide food or habitat for listed species could cause death or injury to some individuals of those species," ground disturbance associated with routine maintenance "can crush or bury animals and plants and destroy burrows" of listed species, "[d]irect feeding upon any rodenticide bait would likely kill or cause serious injury to any animal," application of herbicides may also "have direct adverse effects upon amphibians through contact with their skin." Ex. 3 to Pl.'s Motion to Augment Record (Nov. 19, 2004).

maintenance activities. Beyond that, they maintain, an action agency is not required to "engage in speculation in an attempt to identify potential adverse effects." Fed. Defs.' Br. at 21. Friant defendants make a similar argument, responding to plaintiffs' argument by asking: "How in the world is Reclamation supposed to consult with FWS—other than programmatically—about erosion gullies, gopher holes, and the burrowing activity of ground squirrels? Which gullies? Which gopher holes? Which squirrel burrows? . . ." Friant Defs.' Br. at 48.

Defendants maintain that FWS ultimately satisfied ESA because operations and maintenance activities were considered in FWS's November 2000 Programmatic Biological Opinion. Friant Defs.' Br. 45–46. The argument is not persuasive.

It is important to note that the 2000 BiOp discussion is to be used only for "programmatic purposes." The O & M discussion spans approximately 3 pages and is very general in nature, describing future commitments and consultations. Further, although the 2000 BiOp made clear other documents could be tiered from it, the BiOp also made clear that it could not be used to supplant the analysis required for actions, such as the long-term contract renewal, which required separate section 7 analysis ("It is understood that these provide only general information and the Service and Reclamation will work together on site specific needs for operation

and maintenance actions"). BORESA 052990.

While it is true that FWS and the Bureau could not have known about all the potential impacts of individual O & M activities, this argument misses the mark. The law requires consideration of the effects of interrelated and interdependent activities whether or not all of the activities' impact is known. ESA requires that BiOps consider the entire agency action. *Sierra Club v. Marsh,* 816 F.2d 1376, 1387 (9th Cir.1987). Here, it is undeniable that maintenance activities allowed for the water delivery under the contracts and would not have occurred "but for" the renewal of the contracts. FWS's "phasing approach" to O & M activities was "not coextensive with the agency action" and was therefore arbitrary, capricious and not in accordance with the law. *Conner,* 848 F.2d at 1457–58.[43] The court wishes to be clear, it may well be that some O & M activities could not be accounted for in the BiOp because they were unknown. The fact that extensive O & M activities was absolutely certain, however, requires that the activities be analyzed under § 7.

#### b. *FWS's Use of Historical Average Water Deliveries*

Plaintiffs contend that FWS's jeopardy opinion should be set aside on yet another ground. They argue that FWS consulted on an amount of water that is significantly less than what was authorized by the water contracts. They maintain that § 7 requires that the action agency consult, and that FWS render BiOps on the effects of the action that is actually authorized by the action agency. 50 C.F.R. §§ 402.02, 402.14.[44] The record re-

---

**43.** In *American Rivers v. United States Army Corps of Engineers,* 271 F.Supp.2d 230, 255 (D.D.C.2003), the court explained why segmented consultations do not conform to the requisites of the statute:

If FWS were allowed to apply such a limited scope of consultation to all agency activities, any course of agency action could ultimately be divided into multiple small

actions, none of which, in and of themselves would cause jeopardy. Moreover such impermissible segmentation would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species.

**44.** "Action" means all activities or programs of any kind *authorized, funded, or carried out,*

flects that FWS failed to do so, instead consulting on approximately less than half of what was authorized in the long-term contracts.

Defendants maintain that the regulation is in the alternative, *"authorized, funded, or carried out"*, and the agencies consulted on the amount of water actually to be delivered as determined by historic deliveries, i.e., "carried out." Even assuming that the regulation is in the alternative, the argument fails.

It is clear that the language "carried out" is retrospective, and thus is not relevant to the matter at bar, which is the consummation of contracts for the future delivery of water. Because the contracts are for future delivery, and the amount of water actually to be delivered will vary from year to year and is thus uncertain, the only alternative which applies is the amount of water authorized to be delivered by those contracts. Put another way, the contemplated action is the execution of the water contracts. That execution will authorize the delivery of water, but clearly the execution of the contracts will not, in itself, carry out that delivery. As I now explain, given this conclusion, the BiOp

was inconsistent was the agencies' ESA duties.

The Friant long-term contracts cumulatively authorized the Bureau to deliver more than 2.1 million acre-feet of water per year, for twenty-five years.[45] Rather than analyzing the effects of 2.1 million acre-feet of water delivery, FWS explained that its "effects analysis is conducted under the expectation that water will be delivered to CVP service contractors in quantities that approximate historic deliveries (1988 through 1997), as given in Appendix D of the November 21, 2000 programmatic long-term CVP contracts consultation." This assumption was made, the BiOp explained, because "delivery of full contract quantities is unrealistic." BORESA 040105. An examination of Appendix D reveals that the historic deliveries for the water districts at issue totaled over 850,-000 acre-feet.[46] Further, Table 1.4, which is included in the 2001 BiOp and which lists the Friant Division and Cross Valley Water Contractors, puts the historic annual deliveries at 799,411 for the Friant districts and 53,574 acre-feet for the Cross Valley Contractors. BORESA 039993–039995.

in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air. 50 C.F.R. § 402.02. The agencies must consult on the effects of "the action" and cumulative effects on the listed species or critical habitat. 50 C.F.R. § 402.14.

45. The BiOp states that "[f]ull entitlements" under the contract are 2,115,975 acre-feet for the Friant Division and 128,300 acre-feet for the Cross–Valley Division. BORESA 039991. However, as plaintiffs point out, FWS used several different figures in describing the full

quantity of water to be delivered. In Table 1.4 of the BiOp, the "Total of All Entitlements" is listed as 2,141,475 acre-feet, BORESA 039994, and where the Opinion incorporates the contract quantities that were used in "Appendix D" of an earlier consultation, the total contract quantities exceed 2.18 million acre-feet. BORESA 040105; BORESA 047873. While these numbers vary slightly in the record, the court is satisfied that the full quantity of water authorized by the contracts exceeded 2.1 million acre-feet.

46. Appendix D lists all the CVP Contractors, rather than just the CVP contractors involved in this dispute, but based on what the court can tell, the amount of water consulted on is somewhere between 850,000 and 950,000 acre-feet.

Even though it is unclear what the exact amount of the historic annual delivery was between 1988 and 1997 for all of the water districts at issue, it appears clear that the amount was approximately half of what the water districts were authorized to receive through the contracts. Simply put, FWS did not evaluate the effects of the entire authorized agency action. Significantly, on the same day that the FWS BiOp was issued, Frank Michny, of the Bureau of Reclamation, e-mailed an FWS scientist, that:

> Our view is that we are consulting on full contract amts for each district, recognizing that total deliveries in certain areas may be limited by OCAP. We will agree that we will consult on any BOR action that may affect listed species ... If changing project description to above results in a J[eopardy] opinion I have been informed, "so be it."

FWS AR 08023996.[47]

Just hours before the FWS BiOp was to be issued, the Bureau's regional environmental officer explicitly told FWS that it was to consult on "full contract amts," yet FWS failed to do so. As discussed above, "biological opinions must be coextensive with the agency action." *Conner*, 848 F.2d at 1457–58 (9th Cir.1988). There is no question that ESA requires that all im-

pacts of agency action—both present and future effects—be addressed in the consultation's jeopardy analysis. *Id.* The fact that it was thought by FWS that "delivery of full contract quantities is unrealistic" and that "deliveries continue to be impacted by existing climate, hydrology, actions and statutes, ... socio-economic factors" does not excuse consulting on the "entire agency action," which was the authorized delivery of over 2.1 million acre-feet of water, and nothing less than that.[48]

Friant defendants' attempt to excuse FWS by pointing out that FWS created a mechanism whereby it would coordinate with Reclamation "when the quantity of water to be delivered to the contractors *exceeds the average historical deliveries* ..." (emphasis in original).[49] BORESA 040105. Friant Defs.' Br. at 36. This argument is unavailing. ESA mandates that biological opinions must be coextensive with the action authorized, 50 C.F.R. § 402.02, and does not permit incremental-step consultations. *Conner*, 848 F.2d at 1457–58. Because 2.1 million acre-feet of water was authorized by the long-term contracts, FWS was required to analyze the direct and indirect effects of delivering 2.1 million acre-feet of water.[50]

Federal and Friant defendants argue that this court cannot substitute its judg-

---

**47.** During oral argument on April 13, 2005, the court asked the parties which documents were considered part of the administrative record. Counsel for Federal defendants conceded that internal communications between the action agency and the consulting agencies, including e-mails and other memorandum, were to be considered part of the administrative record.

**48.** The court must say it can't imagine why FWS thought the Bureau was contracting for double the amount the Service thought was realistic, and why the Bureau insisted it wasn't kidding.

**49.** The BiOp explains that FWS assumed "that, if deliveries are to be provided in ex-

cess of the maximum historic deliveries identified in that Appendix D, Reclamation will determine if these deliveries may affect listed or proposed species and/or critical habitat, and will include the Service in that determination." BORESA 040105.

**50.** Plaintiffs also object to this mechanism created by FWS because the trigger for further consultation is not reached until the Bureau delivers 1,728,582 acre-feet per year (the maximum historical deliveries to the Friant Division identified in Appendix D), well in excess of the actual amount analyzed by FWS in its BiOp. Pls.' Br. at 41.

ment for that of FWS, and that the decision to analyze the average of actual water delivery amounts was within FWS' discretion. I cannot agree.

While it is true that ESA does not dictate any specific method FWS must employ to evaluate effects, it does require using a method which adequately considers the impact of the action. *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 964 (9th Cir.2003). The question here, however, is not the method the agency employed to analyze impact, but what in fact was the scope of the proposed activity.

The scope of agency action and the proper scope of FWS' review are legal questions that do not require scientific expertise, as defendants suggest. *See Conner*, 848 F.2d at 1453 (adopting D.C. Circuit test of determining adequacy of biological opinion by matching the meaning of "agency action" with a legal definition of term). This court, therefore, is not required to defer to the FWS.

Moreover, even if I were required to give deference to the Agency's decision, I would still conclude that FWS violated the statute because it failed to analyze the proper scope of the project. In this regard, the Bureau candidly related the scope of activity it sought to have authorized, and the FWS simply ignored that request. Put differently, what method FWS employed to analyze the effects was irrelevant since it was not analyzing the activity

in question. I conclude that FWS's decision to consult on "historical annual deliveries," rather than the full amount authorized by the contracts, violates ESA.[51] 50 C.F.R. § 402.02, 402.14.

### 2. *FWS' Assumption that the Bureau would Implement Mitigation Measures (Plaintiffs' Fifth Claim)*

■ In the "effects" section of their 2001 BiOp, FWS explicitly relies on a list of commitments contained in the BiOp which "are intended to reduce, ameliorate, or reverse effects of the Friant and Cross Valley water diversions," and that FWS "assumed that these measures will be effective." FWS BORESA 040125. The conclusion section of the BiOp states that the "conclusion" [of no jeopardy] is "based on the assumption that measures in this biological opinion are fully implemented." BORESA 040128. Plaintiffs question FWS's reliance on the Bureau's commitments. They argue that the assumption that the Bureau would follow through with the commitments is arbitrary and capricious "[i]n light of the Bureau's checkered track record with conservation commitments it had made as part of biological opinions on earlier rounds of Friant contracts."[52] Pls.' Br. at 47.

Section 7 implementing regulations require the Services in assessing the likely effects of an action, to take into account

---

**51.** Plaintiffs alternatively argue that even if FWS's use of average historical deliveries rather than the authorized amounts was lawful, FWS was at least obligated to explain why the data set it chose to analyze accurately represented future deliveries. Pls.' Br. at 37. Since it is clear that FWS consulted on something other than the full amount authorized in the water contracts, the court need not engage plaintiffs' alternative argument.

**52.** Plaintiffs also point to FWS internal documents where staff or officials were skeptical of the Bureau's commitments. In 1999,

Wayne White, the signatory of FWS' 2001 BiOP, noted that "[o]ur earlier [no jeopardy opinion] was based on compliance which they have not fulfilled." FWS AR 06015784. Similarly, in 2000, FWS's CVPIA team noted that "[i]n past large scale, program-level opinions we (the Service) have had considerable experience with BOR not complying with biological opinions that we have written .... It was apparent early on that the measures included to reach no-jeopardy were insufficiently funded, on reasonably long time lines, or not implemented at all." FWS AR 06018628.

"effects" that are "caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02. Mitigation measures must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards. *Sierra Club v. Marsh,* 816 F.2d 1376, 1380, 1387–88 (9th Cir.1987).

Although plaintiffs argue that the measures set forth in the BiOp "were not reasonably certain to occur," most of their arguments relate to the long history of consultation involved in this case, beginning in 1991, rather than to the 2001 BiOp and the consultation process surrounding it. Thus, they point out that since 1991, the Bureau has still failed to provide FWS with maps where listed species occurred, that the Bureau has still failed to develop a plan to compensate for losses of endangered species habitat from land conversion, and that the Bureau has made limited progress on monitoring land use changes and ongoing activities in the water districts. Pls.' Br. at 47. Indeed, in their 2001 BiOp, FWS notes that the Bureau has made "limited progress" or is "progressing" with some of the commitments just noted. *See* FWS AR 01001535, 01001537, 040022, 03005772. As stressed by defendants, however, FWS also noted that many of the twenty-four commitments were being implemented, or in the process of being implemented. Plaintiffs themselves concede that the Bureau has implemented some of its prior commitments ("This is not to say the Bureau had done nothing with respect to its prior mitigation commitments; it had."). Pls.' Br. at 46. Of the 24 or so commitments, it appears that FWS recognized that the Bureau had made progress or was in the process of implementing at least 20 of the commit-

ments. Although it is not unreasonable to describe the Bureau's "track record" as discouraging, I cannot conclude that the commitments made in the 2001 BiOp "were not certain to occur, were not capable of implementation, or were unenforceable." *See Sierra Club v. Marsh,* 816 F.2d at 1830, 1387–88.

Accordingly, I cannot conclude that FWS' reliance on the Bureau's commitments to implement the specified mitigation measures was arbitrary, capricious, or not in accordance with the law.

### 3. *NMFS' Jeopardy Analysis of Spring-run Chinook Salmon and Steelhead (Plaintiffs' Sixth Claim)*

 Plaintiffs challenge NMFS's jeopardy analysis of Central Valley spring-run Chinook salmon and Central Valley steelhead. Specifically, plaintiffs maintain that NMFS may not satisfy its obligations under ESA relative to spring-run chinook and steelhead by relying on its analysis of the winter-run chinook. Plaintiffs also contend that defendants did not complete consultation on steelhead and spring-run chinook before issuing their "no jeopardy" determination in the 2001 BiOp. The record supports plaintiffs' contentions.

NMFS's 2001 BiOp asserted, without elaboration, that there were provisions in "the winter-run biological opinion ... designed to keep emigrating winter-run chinook juvenile on the northern side of the delta" which would "also minimize exposure of spring run chinook and steelhead." BORESA 041554. In another section of the BiOp, NMFS explained that "an analysis of the impacts of water storage and delivery within the CVP ... on winter-run Chinook salmon can be found in the existing NMFS 1993 biological opinion on the CVP/SWP Operations," which is "representative of effects on spring-run chinook and steelhead generally and more specifically where they overlap in distribution."

BORESA 041553. Put directly, there is no explanation as to why measures designed to mitigate harm to the winter-run chinook would also apply to the spring-run or steelhead. If there is a scientific basis for this analysis, NMFS was required to provide that explanation in its BiOp. Under ESA, NMFS was required to articulate a rational connection between the facts found and the decision made. It failed to do so.

Plaintiffs' assertion that consultation on the spring-run chinook and the steelhead was not completed prior to the "no jeopardy" determination is also supported by the record. NMFS explained that a 1993 BiOp which described operating criteria and procedures necessary to avoid jeopardy of winter-run chinook was being updated to include spring-run chinook salmon and steelhead. NMFS also explained that with regard to the spring-run chinook and steelhead, it could not determine the extent of "take associated with the diversion of a volume of water independent of consideration of operational criteria," so "it would not authorize incidental take, but would defer until completion of the revised opinion on CVP/SWP operations," which was expected in March 2001, after the water contracts were to be signed. BORESA 041537. In essence, NMFS admitted in its BiOp that consultation on the steelhead and the spring-run chinook had not been completed even as it issued its "no jeopardy" determination in its 2001 BiOp.

Federal defendants concede that "at the time the NMFS 2001 BO was issued, a consultation on the effects of CVP operations on spring-run chinook and steelhead was underway" rather then completed. Fed. Defs.' Br. at 17. They argue that this was acceptable because "effects on the listed species of the delivery of certain volumes of water cannot be identified and isolated from the effects of the larger operational parameters of the CVP." *Id.* They also contend that NMFS justifiably relied on the previous BiOp issued in 1993 to address the effects of CVP operations on spring-run chinook and steelhead. *Id.* The argument does not lie.

Put simply, if NMFS could not determine the extent of take associated in isolation from larger CVP operations, which was undergoing consultation concurrently, it was arbitrary and capricious for it to issue its "jeopardy determination" on steelhead and spring-run chinook before that consultation was completed. *See* 16 U.S.C. § 1536(d).

Friant defendants again argue that this BiOp was "tiered" off of other BiOps, including the 2000 Programmatic BiOp. This argument, however, is unavailing since the 2001 BiOp made no mention of the 2000 BiOp in its analysis and because the CVPIA BiOp considered the implementation of the CVPIA, not site-specific operations of the CVP. In fact, the 2000 BiOp explicitly noted that "Long-term contract renewals are subject to a separate, tiered analysis . . . ." BORESA 029563.

As with the winter-run chinook, Friant defendants also argue that the proposed action has no effect on these species because their critical habitat is not located in the action area. Regardless of whether critical habitat is designated, however, an agency must consult with the Secretary where an action will "jeopardize the continued existence" of a species. 16 U.S.C. § 1536(a). The record indicates that there were species of steelhead and spring-run chinook in areas that could be affected by the contract renewals.[53] Finally, Friant

---

**53.** NMFS's BiOp notes that the proposed action has the potential to affect the spring-run and steelhead because "[a]ll river reaches and estuarine areas of the Sacramento–San Joa- quin Delta may be used seasonally by adult and juvenile . . . spring-run chinook salmon . . . ." BORESA 041550. *The BiOp also notes that "evidence has been gathered over the*

defendants point to other passages in the 2001 BiOp which they imply may be "adequate" to meet ESA's rigorous standards. Friant Defs.' Br. at 21. While the BiOp does contains other passages about the steelhead trout and the spring-run chinook, these passages appear to support a jeopardy finding, rather than the "no jeopardy" determination issued by NMFS.[54] For all the reasons stated above, I conclude that NMFS's no jeopardy determination as to the spring-run chinook salmon and steelhead is not in accordance with the law.

### 4. NMFS's Consultation with the Bureau on the Hidden and Buchanan Contracts (Plaintiffs' Sixth Claim) [55]

■ According to plaintiffs, NMFS violated ESA because it "never even attempted to conduct the analysis required by section 7 or issue a biological opinion that addresses the Hidden and Buchanan contracts." Pls.' Br. at 54. Once again, the record supports the contention.

It is undisputed that the Hidden and Buchanan water units are not part of the Friant Division, but provide CVP water to two contractors in the Friant Division, Chowchilla Irrigation District and Madera Irrigation District. FWS AR 08023621. These two Friant districts have additional contracts with the Bureau for delivery of water from the Hidden and Buchanan CVP units. Pls.' SUF 13.[56] The Hidden Unit contract provides for delivery of 24,-000 acre-feet of water annually from Hensley Lake to Madera Irrigation District. The Buchanan Unit contract provides for delivery of 24,000 acre-feet annually from Eastman Lake to Chowchilla Water District.[57] Friant Defs.' SUF 49, citing BORESA 041538. The renewal contracts

---

past few years that shows an extant, self-sustaining run [of steelhead] in at least the lower reaches of the San Joaquin River." BORESA 041551.

**54.** The BiOp stated that:

The diversions will continue to eliminate most of the upper San Joaquin River's contributions to flows to assist emigration of juvenile fall-run salmon and steelhead in late winter and spring months .... The Central Valley Steelhead ESU will be affected to the extent that the small portion of the ESU that is present in the San Joaquin system will continue to be precluded from reoccupying the upper San Joaquin River. The steelhead will also continue to experience diminished flows to facilitate immigration and emigration. This effect is minimized by ongoing programs to improve rearing and migration conditions .... BORESA 041553–54.

**55.** In contrast to NMFS, which did not formally consult with the Bureau on the Hidden/Buchanan contracts, FWS did request formal consultation. Although defendants also discuss FWS's consultation on the Hidden/Buchanan units, plaintiffs did not address this in their brief.

An internal FWS memorandum noted that a FWS biologist "decided on 1–19–01 to not include Hidden and Buchanan Unit Contracts in the Friant–Cross Valley Opinion due to insufficient time to make the necessary changes in the project description and effects." BORESA 045889, 041752. On February 1, 2001, the Bureau formally requested consultation with FWS on the Hidden and Buchanan contracts. Pls.' SUF 19, citing FWS AR 09024891. On February 14, 2001, FWS issued a new biological opinion for the Hidden and Buchanan contracts. Pls.' SUF 16.

**56.** The contracts are referred to as Chowchilla Water District, Buchanan Unit (Contract # 14–06–200–3844A–LTR1) and the Madera Irrigation District, Hidden Unit (Contract # 14–06–200–4020A–LTR1). Id.

**57.** The Hidden and Buchanan contracts pertain to deliveries from separate dams on separate bodies of water. Water from the Friant Division comes from the San Joaquin River at Millerton Lake and goes through Friant Dam, whereas Buchanan and Hidden Units provide water through H.V. Eastman and Hensley Lakes and must go through Buchanan and Hidden Dams. FWS AR 08023621.

concerning Hidden and Buchanan reservoirs were executed by the Bureau on February 14 and 15, 2001.

On January 5, 2001, when the Bureau requested formal consultation on the Friant contracts, there was no mention of the Hidden or Buchanan water contracts. Pls.' SUF 22, citing NMFS AR 000526. On January 26, 2001, approximately 6 days after NMFS's BiOp on the Friant Division and Cross Valley Canal Unit Contracts was issued, the Bureau wrote a letter to NMFS as follows:

We have reviewed the ESA section 7 compliance documents for the Friant Division contracts including your final biological opinion dated January 12, 2001. We have noted that through an apparent oversight on our part, the tables provided to the you [sic] as part of the project description (and thus those in your project description) did not include the Hidden and Buchanan Contracts. However the delivery of this water from H.V. Eastman and Hensley lakes is discussed in your project description. In addition, we have discussed this with your staff and they have confirmed that the delivery of the water under the Hidden and Buchanan contracts and any effects of this delivery on species of concern were addressed in the referenced biological opinion.

On February 12, 2001, NMFS issued a letter in response to the Bureau's request, asserting that NMFS did, in fact, "consider the effects of the Hidden and Buchanan contracts in the Biological Opinion issued to the Bureau on January 20, 2001."[58] Pls.' SUF 19, citing NMS AR 0008881, *et seq.*, NMFS AR 000915, Pls.' SUF 50, NMFS AR 000884, 000885, 000913, 000915.

Consequently, the Bureau did not request formal section 7 consultation from NMFS on the Hidden and Buchanan contracts. Pls.' SUF 52, citing NMFS AR 000526–27, 000885, 000881. No biological opinion was ever issued by NMFS on the Buchanan and Hidden units. *Id.*

Plaintiffs urge a violation of ESA because they claim that no consultation was ever completed on the Hidden and Buchanan contracts before they were signed. Alternatively, plaintiffs argue that the BiOp is invalid as to the Hidden and Buchanan contracts because its analysis on these water districts fails to comply with ESA's rigorous standards. Pls.' Br. at 55.

The Bureau's letter to NMFS, after the January 20, 2001 BiOp was issued, noted that through an "apparent oversight on [its] part," the tables provided to NMFS as part of the project description did not include the Hidden and Buchanan units. Furthermore, in the cover letter that was attached to its 2001 BiOP (written to the Bureau), NMFS explicitly stated that the letter *transmits the BiOp on the long-term renewal of the water contracts "for the Friant Division and Cross Valley Canal Unit Contractors,"* and there is no mention of the Hidden or Buchanan water units. Moreover FWS, in contrast to NMFS, did request formal consultation on these two units because they concluded that they *could not include analysis of the Hidden and Buchanan units "due to insufficient time to make the necessary changes in the project description and effects."* FWS AR 09024885.

Defendants' contention that the analysis covered these two contracts is also undermined by the fact that there exists internal

**58.** The letter reads, in pertinent part:
This is to confirm, in response to your letter of January 26, 2001 to Dr. Rebecca Lent, that the National Marine Fisheries Service did consider the effects of the Hidden and Buchanan Contracts in the Biological Opinion issued to the Bureau of Reclamation on January 20, 2001. No further consultation on those contracts is necessary . . . .

correspondences from the Bureau which explicitly acknowledges that it did not request consultation on Hidden and Buchanan due to a mistake on its part. An e-mail from Frank Michny of the Bureau to an FWS scientist, Cay Goude, admitted that there was a "glitch" in the consultation "in that Hidden and Buchanan contracts were not in project description" and that "[t]his has become a big issue . . . ." The Bureau recognized that it did not provide the information required for the consulting agencies to even consider the effects of the Hidden and Buchanan units in its BiOps. FWS AR 09024886. Mr. Goude was alarmed enough to forward that e-mail on to other scientists working on the FWS BiOp, with one sentence which reads, "what should we do. help. cay." FWS 09024886.

Despite all the above, the Friant and Federal defendants insist that NMFS did consider the effects of Hidden and Buchanan in their Friant Division/Cross Valley Canal Unit January 2001 BiOp. Defendants cite to a myriad of charts and discuss various figures supposedly in support of that contention.

First, Friant defendants argue that the Hidden and Buchanan units were considered in NMFS's January 2001 BiOp because there is one sentence in the BiOp which states that "2 contractors in the Friant Division also receive water from H.V. Eastman Lake and Hensly Lake." BORESA 041538. This sentence, in and of itself, is hardly convincing evidence that the Hidden and Buchanan contracts were analyzed in the effects section. Both defendants also point to an inconsistency in the contract entitlement numbers contained in two places in the BiOp. They note that the "proposed action" section of the BiOp states that "Entitlements are 737,500 for Class 1 Water and 1,387,475 for Class 2 for Friant Division." On the next page, they point out to Table 1, which lists the "water entitlements for the Friant Division,", as showing for Class 1 692,802 and 1,149,477 for Class 2. BORESA 041537–041539. Friant and Federal defendants argue that this discrepancy of 282,695 acre-feet between the water delivery amount listed in the chart and that described in the "proposed action" of the BiOp reflect that the Hidden and Buchanan units were, in fact, considered. They maintain that this substantial difference is more than enough to cover the 48,000 acre-feet that was delivered from Hidden and Buchanan. As I now explain, the argument is not persuasive.

First, accepting defendants' arguments about the discrepancy in the numbers would require the court to make inferences about the consultation process which simply are not supported anywhere in the BiOp. As the court has noted previously, "we cannot infer an agency's reasoning from mere silence," and that "in considering the BiOps, we may only rely on what the agency said in the record to determine what the agency decided and why." *Gifford Pinchot,* 378 F.3d at 1072 (citing *Beno v. Shalala,* 30 F.3d 1057 (9th Cir.1994)). Because the BiOp nowhere reflects that the effects of the Hidden and Buchanan units was considered, the court cannot accept defendants' arguments. Secondly, plaintiffs compellingly note that Table 1, which lists the "water entitlements for the Friant Division," according to the 2001 BiOp, is identical to the chart on Appendix D contained in FWS's 2001 CVPIA BiOp ("Mother Opinion,"), which lists the water deliveries for all CVP contractors. The numbers listed under Friant Division for the Madera and Chowchilla districts from Appendix D match exactly the water delivery amounts contained in Table 1 of NMFS's 2001 BiOp. In both tables, "maximum annual delivery" for Madera Irrigation District is 213,500 and "maximum annual delivery"

for Chowchilla Water District is 168,709. The last page of Appendix D identifies additional "maximum annual deliveries" from "miscellaneous" units, including 24,-000 for Chowchilla Water District from Buchanan Unit and 24,000 acre-feet for Madera Irrigation District from the Hidden Unit. FWS AR 06020481.

Based on the actual content of the administrative record, defendants' post hoc argument that NMFS did, in fact, consider the impacts of the Hidden and Buchanan contracts in its Friant BiOp cannot be accepted. Because it appears that the Bureau never consulted on these two units before signing the contracts in February, they are in violation of ESA's mandate that consultation must be complete as to the entire project before the action is initiated or any of its components undertaken. *See Conner,* 848 F.2d at 1453; *Lane County Audubon Soc'y v. Jamison,* 958 F.2d 290, 295 (9th Cir.1992).

### D. THE BUREAU OF RECLAMATION'S LIABILITY UNDER ESA (PLAINTIFFS' FOURTH CLAIM)

▆ Plaintiffs allege that the Bureau committed resources before completing ESA section 7 Consultation (plaintiffs' fourth claim).[59] As discussed above, because NMFS did not issue a BiOp on the Hidden and Buchanan contracts in its consultations on the Friant contracts before executing the contracts, the Bureau violated Section 7(d) of the Endangered Species Act.

Plaintiffs also argue that the Bureau violated ESA by not independently ensuring that its own actions do not cause jeopardy to listed species or adverse modification to species and their habitat. De-

fendants, on the other hand, contend that the BiOps were not unlawful and the Bureau's reliance on them was reasonable.

The Ninth Circuit has previously addressed situations in which a consulting agency issued a faulty "no jeopardy" opinion and the action agency adopted it. No bright line test emerges from those cases, but the Circuit has concluded that an action agency may not escape its responsibility under the Endangered Species Act by simply relying on the consulting agency's analysis. *See Resources Ltd., Inc. v. Robertson,* 35 F.3d 1300, 1304 (9th Cir.1993); *Pyramid Lake Paiute Tribe v. United States Dept. of Navy,* 898 F.2d 1410, 1415 (9th Cir.1990) ("A federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species ...."). On the other hand, the Circuit has also concluded that an action agency need not undertake a separate, independent analysis in the absence of new information not considered by the consulting agency in reaching its "no jeopardy" conclusion. *See Stop H-3 Ass'n v. Dole,* 740 F.2d 1442, 1460 (9th Cir.1984). In some circumstances, the court has required the party bringing this claim to "put forth new information which the consulting agency did not take into account in rendering its opinion." *See Pyramid Lake Paiute Tribe, supra.* Finally, the Circuit has also upheld an action agency's adoption of a "no jeopardy" finding even when based on admittedly "weak" best available evidence. *See Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir. 1992).

Despite what appears to be somewhat conflicting holdings, all of the cases hold

---

**59.** Te section provides:
the Federal agency ... shall not make an irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the for-

mulation or implementation on of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

that the action agency may be liable if its reliance on the consulting agency's analysis was arbitrary or capricious. As I now explain, the record demonstrates that the Bureau's renewal under the circumstances was arbitrary and capricious.

While numerous examples may be found, *see* Pls.' Br. at 58–60, perhaps the clearest instance of arbitrary conduct was when the Bureau, knowing that FWS based its analysis on less than the full contract amount, nevertheless, adopted a "no jeopardy" finding. Having knowledge that FWS did not analyze the action authorized, the Bureau had no reasonable basis to rely on FWS's BiOp in order to bypass its own responsibility to ensure that the federal action would not jeopardize listed species and critical habitats. *See Pyramid Lake,* 898 F.2d at 1415. Because the Bureau failed to carry out its duty to ensure against jeopardy and adverse modification, and because the Bureau knew of the deficiency, the court must conclude that its conduct was arbitrary and capricious.

## E. REINITIATION OF CONSULTATION (PLAINTIFFS' FOURTH, FIFTH, AND SIXTH CLAIMS)

▆ Plaintiffs' final argument is that Federal defendants were required to reinitiate consultation.[60] Plaintiffs argue that a 2002 decision issued by Judge Wanger constituted "new information" that gave rise to a duty to reinitiate consultation on the long-term renewal of the Friant contracts, because it may "affect listed species or critical habitat in a manner to an extent not previously considered." Plaintiffs explain that in February 2001, at the time the long-term contracts were signed, the Bureau of Reclamation was under a duty, under Section § 3406(b)(2) of the CVPIA, to dedicate and manage annually 800,000 acre-feet of CVP yield for environmental purposes.[61] In February 2002, a year after the contracts were signed, Judge Wanger issued an order which prohibited the Department of Interior from using offset/reset matrices in accounting for use of water under § 3406(b)(2), to impermissibly alter the 800,000 acre feet of designated water by Congress. *See San Louis & Delta–Mendota Water Auth. v. United States,* CIV F–97–6140 OWW, Supp. Mem. Dec. and Order Re: Summ. Judg. Mot. at 15–17 (Feb. 5, 2002). The Ninth Circuit affirmed that ruling in *Bay Institute of San Francisco v. United States, aff'd in part, rev'd in part on other grounds,* 87 Fed.Appx. 637 (9th Cir.2004).

Plaintiffs contend that complying with Judge Wanger's ruling would have the effect of diminishing the fish protection flows from CVPIA(b)(2) by approximately 400 TAF (thousand acre feet), and that "there is no question that reduction for

---

**60.** Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

 (a) If the amount or extent of taking specified in the incidental take statement is exceeded;

 (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

 (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

 (d) If a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16. *See Environmental Protection Information Center v. The Simpson Timber Co.,* 255 F.3d 1073, 1076 (9th Cir.2001).

**61.** Section 3406(b)(2) provides that the "primary purposes" to which the 800,000 acre feet may be used to "help" meet obligations under the Endangered Species Act and to "assist" in meeting water quality standards.

several hundred thousand acre-feet in annual flows 'may affect listed species or critical habitat in a manner or to an extent not previously considered.'" Pls.' Br. at 62, citing Friant Defs.' Motion to Augment the Record, Ex. 3, at 5.[62] Friant defendants, on the other hand, argue that the Bureau and the consulting agencies have already reinitiated consultation on the renewal of the Friant Division contracts, but the documents they cite do not support that proposition.[63] Friant defendants alternatively argue that once the contracts were executed, Reclamation lost its discretion to amend them to address the needs of threatened or endangered species.

During oral argument, both Friant and Federal defendants explained that Judge Wanger's decision relates to the entire operation of the CVP, and that the decision may not specifically affect the water units at issue in this litigation. Friant defendants explained that the decision "might" impact the Friant, Buchanan, and Hidden deliveries, but that the water may come from other divisions as well. Plaintiffs, however, contend that since it is unclear exactly what the impacts are, reinitiation is required so NMFS can consider what the impacts are, and whether the Friant contracts still meet the no jeopardy and no adverse modification standard under ESA.

Under ESA's implementing regulations, "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," reinitiation of formal consultation is required. 50 C.F.R. § 402.16. Thus, the issue appears not to be whether it can be determined with certainty that Judge Wanger's decision would affect the units at issue in this litigation. So long as new information reveals that the decision "may" affect listed species, reinitiation of consultation is required under ESA. Nonetheless, as I explain below, I agree with defendants that reinitiation was not required.

As Friant defendants maintain, reinitiation of consultation can only happen where "discretionary Federal involvement or control over the action has been retained or is authorized by law." 50 C.F.R. § 402.16; see *Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir.2001).

Unfortunately, the parties provide no help in resolving whether under the contracts the federal government retained the

---

**62.** As NMFS explains in one of the documents relied on by the Friant defendants:

> In 2002 [spring-run/steelhead] OCAP opinion, Reclamation was assumed to operate the CVP using the October 1999 Federal court decision on implementation of CVPIA b(2) flows. Beginning in 2001, however, Federal court rulings have ... disallowed the use of offset and reset rules (i.e., crediting) on reservoir storage and Sacramento–San Joaquin Delta pumping. Compliance with these rulings has the effect of diminishing the fish protection flows from CVPIA (b)(2) by approximately 400 TAF [thousand acre feet].

Friant Def.'s Mot. to Augment to Admin. Record at Ex. 3, p. 5 (October 7, 2004).

**63.** Friant defendants first cite to the long-term OCAP BiOp on CVP operations issued by the FWS on July 30, 2004. Friant Defendants' Motion to Augment, Ex. 2, p. 23. Although there is a section in that BiOp which briefly mentions Section 3406(b), it clearly was not a BiOp that was written in response to a request for reinitiation on the Friant contracts. Rather, the BiOp was a request for formal consultation on the Operating Criteria and Plan in California (OCAP), operations of the CVP, and operations of the State Water Project (SWP). They also assert that defendants have reinitiated consultation, citing to a request for consultation on the renewal of interim contracts (for the period April 1, 2004—March 31, 2006). This interim BiOp does not cover the effects of the twenty-five year Friant contracts and cannot be considered an effort on the part of the Bureau to reinitiate consultation on the Friant contracts. Friant Defendants' Motion to Augment, Ex. 3.

power to amend for environmental protection. Plaintiffs fail to address the issue, and the Federal defendants' brief is completely silent on the issue of reinitiation of consultation. Finally, the Friant defendants misread *Environmental Protection Information Center* to hold that "[o]nce the renewal contracts were executed, Reclamation lost its discretion to amend them to address the needs of threatened or endangered species." Friant Defs.' Br. at 57. To the contrary, in *Environmental Protection Information Center,* the court examined the permit to determine whether discretion had been retained. In like manner, this court must examine the contract to determine the scope of discretion, if any, retained by the Government.

Equally unfortunate, none of the parties have directed the court to the appropriate passage(s) in the water contracts which would allow the court to determine whether a specific contractual provision provided discretionary power on the part of the services to demand additional measures to protected listed species or their critical habitat.

Upon the court's own examination of the Friant, Hidden, and Buchanan water contracts, the court concludes that while there are some provisions of the contract which allow for discretion as to how much water may be delivered, none of those provisions specifically relate to measures to protect endangered species. For instance, Article 11(b) of the contracts recites that water "may temporarily be discontinued or reduced to provide for purposes of investigation, inspection, maintenance, repair or replacement of any of the Project facilities." *See* Admin. Record and Other Non–Case Material Cited in Friant Defendants' Refiled Summary Adjudication Briefs, Volume 9 of 10, Tabs 33 (Chowchilla Renewal Contract, exemplar for Friant), 36 (Hidden Contract), and 37 (Buchanan Contract). Article 12 of the contracts also allows for

some flexibility in the amount of water delivered to the contractors if there is a shortage in the quantity of water. Put directly, these contractual provisions do not specifically address whether the Services have the power to reinitiate consultation to protect listed species or critical habitat, and indeed listed species and their critical habitat are not mentioned in any of these "discretionary clauses."

*Environmental Protection Information Center* noted that even though various permit documents discuss some control that FWS may have had to implement conservation measures, none of the measures specifically addressed the scope of FWS's authority to implement measures to benefit species other than the spotted owl. 255 F.3d at 1079–1084. The holding suggests that the case contemplates very specific language in permits or contracts explicitly retaining discretionary control to benefit protected species and their critical habitat. Such language appears to be absent from the contracts at issue. Accordingly, plaintiffs' motion for summary judgment is denied as to this issue, and the Friant defendants' motion is granted.

## IV.

## CONCLUSIONS AND ORDERS

For all the foregoing reasons, the court hereby ORDERS as follows:

1. Plaintiffs' motion for summary adjudication on the critical habitat inquiry is GRANTED (Plaintiffs' Sixth Claim, ¶ 170; Plaintiffs' Fifth Claim, ¶¶ 164, 167).

2. Plaintiffs' motion for summary adjudication on the jeopardy analysis is GRANTED (Plaintiffs' Fifth Claim, ¶ 165; Plaintiffs' Sixth Claim, ¶¶ 171–173).

3. Plaintiffs' motion for summary adjudication as to the Bureau of Reclamation's liability is GRANTED (Plaintiffs' Fourth Claim, ¶¶ 152–156, 158, 161).

4. Defendants' motion as to reinitiation of consultation is GRANTED (Plaintiffs' Fourth Claim, ¶ 160; Fifth Claim, ¶ 168; Sixth Claim, ¶ 174).

IT IS SO ORDERED.